## UDALL, SECRETARY OF THE INTERIOR *v.* TALLMAN ET AL.

No. 34.  Argued October 22, 26, 1964.—Decided March. 1, 1965.

*Wayne G. Barnett* argued the cause for petitioner. With him on the briefs were *Solicitor General Cox, Roger P. Marquis* and *Edmund B. Clark.*

*Charles F. Wheatley, Jr.,* argued the cause for respondents. With him on the brief was *Robert L. McCarty.*

Briefs of *amici curiae,* urging reversal, were filed by *Clayton L. Orn, Marvin J. Sonosky, Oscar L. Chapman, Martin L. Friedman* and *Marion B. Plant* for Marathon Oil Company et al., and by *Abe Fortas, Joseph A. Ball, Gordon A. Goodwin, Francis R. Kirkham, Turner H. McBaine* and *Clark M. Clifford* for Richfield Oil Corporation et al.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

At issue in this case is the effect of Executive Order No. 8979 and Public Land Order No. 487 upon the Secretary of the Interior's authority to issue oil and gas leases.

Between October 15, 1954, and January 28, 1955, D. J. Griffin and other persons—hereinafter collectively referred to as the Griffin lessees—filed applications for oil and gas leases on approximately 25,000 acres located in the Kenai National Moose Range in Alaska. On August 14, 1958, the respondents filed offers to lease the same lands. Section 17 of the Mineral Leasing Act of 1920 provides, in relevant part, that "the person first making application for the lease who is qualified to hold a lease . . . shall be entitled to a lease of such lands without competitive bidding. . . ." 41 Stat. 443 (1920), as amended by 60 Stat. 951 (1946), 30 U. S. C. § 226 (1958 ed.). The Bureau of Land Management of the Department of the Interior determined that the Griffin lessees were the persons who had applied first, and issued to them leases on the tracts, effective September 1, 1958. Respondents' applications were reached for processing in

October 1959, and were rejected on the ground that the lands had been leased to prior applicants.[1]

From the rejection of their applications, respondents appealed to the Director of the Bureau of Land Management and then to the Secretary of the Interior, both of whom affirmed the decision. 68 I. D. 256 (1961). Respondents then brought an action in the nature of mandamus, in the United States District Court for the District of Columbia, to compel the Secretary to issue oil and gas leases to them. The District Court granted summary judgment in favor of the Secretary dismissing the complaint. The Court of Appeals for the District of Columbia Circuit reversed, holding that Executive Order No. 8979, the order creating the Moose Range in 1941, and Public Land Order No. 487, issued by the Secretary in 1948,[2] had withdrawn the lands in controversy from availability for leasing under the Mineral Leasing Act, and that the lands remained closed to leasing until they were reopened by a revised departmental regulation on August 14, 1958. The court therefore held that the Griffin applications, filed while the land was closed, were ineffective, rendering the leases issued on them nullities; the respondents, as the persons first making application

---

[1] Lease offers are processed in the order of filing and a lease on a given tract is issued as soon as an acceptable offer is reached. In the instant case, the Secretary's order of August 2, 1958, 23 Fed. Reg. 5883, directed that all lease offers filed within 10 days of August 14, 1958, would be treated as simultaneously filed, and that a public drawing would be held to determine the priorities among them. See 43 CFR § 295.8 (1964). The drawing was held on September 4, 1959, and respondents prevailed. Thus their offers were processed before all other offers filed between August 14 and August 24, 1958; upon processing, however, it was discovered that the land was already covered by the leases issued to the Griffin lessees.

[2] Public Land Order No. 487 encompassed the land for which respondent Coyle applied; the land for which the other nine respondents filed is covered by Executive Order No. 8979.

after the promulgation of the 1958 regulation, were held to be entitled to the leases. 116 U. S. App. D. C. 379, 324 F. 2d 411 (1963). We granted certiorari, 376 U. S. 961.

We conclude that the District Court correctly refused to issue a writ of mandamus, and accordingly reverse the decision of the Court of Appeals. Since their promulgation, the Secretary has consistently construed both orders not to bar oil and gas leases; moreover, this interpretation has been made a repeated matter of public record. While the Griffin leases and others located in the Moose Range have been developed in reliance upon the Secretary's interpretation, respondents do not claim to have relied to their detriment upon a contrary construction. The Secretary's interpretation may not be the only one permitted by the language of the orders, but it is quite clearly a reasonable interpretation; courts must therefore respect it. *McLaren* v. *Fleischer*, 256 U. S. 477, 481; *Bowles* v. *Seminole Rock Co.*, 325 U. S. 410, 413–414.

I.

The Mineral Leasing Act of 1920, 41 Stat. 437, 30 U. S. C. § 181 *et seq.* (1958 ed.), gave the Secretary of the Interior broad power to issue oil and gas leases on public lands not within any known geological structure of a producing oil and gas field. Although the Act directed that if a lease was issued on such a tract, it had to be issued to the first qualified applicant, it left the Secretary discretion to refuse to issue any lease at all on a given tract. *United States ex rel. McLennan* v. *Wilbur*, 283 U. S. 414. The Act excluded from its application certain designated lands,[3] but did not exclude lands within wildlife refuge areas.

[3] Section 1 of the Act excludes "lands acquired under the Act known as the Appalachian Forest Act, approved March 1, 1911 (36

The Kenai National Moose Range was created in 1941 by Executive Order No. 8979, 6 Fed. Reg. 6471, by which approximately two million acres of the public domain were set aside "as a refuge and breeding ground for moose." The order provided that "[n]one of the above-described lands excepting [a defined area] shall be subject to settlement, location, sale, or entry, or other disposition (except for fish trap sites) under any of the public-land laws applicable to Alaska . . . ." On November 8, 1947, the Secretary promulgated the first general regulation dealing with the issuance of oil and gas leases within wildlife refuges. It provided simply that such leases had to be subjected to an approved unit plan and contain a provision prohibiting drilling or prospecting without the advance consent of the Secretary. 12 Fed. Reg. 7334.

On June 16, 1948, the Secretary issued Public Land Order No. 487, 13 Fed. Reg. 3462:

> "[T]he public lands within the following-described areas in Alaska [including most of that portion of the Moose Range which had been excepted from Executive Order No. 8979] are hereby temporarily withdrawn from settlement, location, sale or entry, for classification and examination, and in aid of proposed legislation:
>
> .     .      .       .       .
>
> "This order shall take precedence over, but shall not modify . . . the reservation for the Kenai Na-

Stat. 961), and those in incorporated cities, towns, and villages and in national parks and monuments, those acquired under other Acts subsequent to February 25, 1920, and lands within the naval petroleum and oil-shale reserves, except as hereinafter provided . . . ," 41 Stat. 437–438 (1920), as amended, 60 Stat. 950 (1946), 30 U. S. C. § 181 (1958 ed.).

tional Moose Range made by Executive Order No. 8979 of December 16, 1941 . . . ."

Thus neither Executive Order No. 8979 nor Public Land Order No. 487 expressly withdrew the lands to which it applied from oil and gas leasing. In 1951, however, the Secretary set aside, for uses inconsistent with mineral leasing, minor portions of the lands covered by Public Land Order No. 487:

"[T]he following-described public lands in Alaska are hereby withdrawn from all forms of appropriation under the public-land laws, including the mining laws and the mineral-leasing laws . . . ." [4]

Had the Secretary thought that Public Land Order No. 487 had already withdrawn the lands covered by it from appropriation under the mineral-leasing laws, his reference to such laws in the 1951 orders would have been superfluous.

By an intra-agency memorandum dated August 31, 1953, the Director of the Bureau of Land Management advised the Regional Administrators of the Bureau and managers of the local land offices that "a possible revision of policy and regulations" on leasing in wildlife refuges was being studied, and directed them that "[p]ending the completion of this study and the possible revision of existing regulations, you will suspend action on all pending oil and gas lease offers and applications for lands within such refuges." It is not disputed, and subsequent memoranda make clear, that the 1953 memorandum did not purport to prevent either the issuance of leases with

---

[4] See Public Land Order No. 751 of August 29, 1951, 16 Fed. Reg. 9044, which withdrew 160 acres for the Civil Aeronautics Administration, and 88.86 acres for townsite purposes, and Public Land Order No. 778 of December 29, 1951, 17 Fed. Reg. 159, which withdrew a number of tracts, aggregating 4,280 acres, for the use of the Army.

the approval of the national office or the continued filing
of lease offers.[5]   During late 1954 and early 1955, a num-
ber of individuals filed applications for oil and gas leases
in the northern half of the Moose Range; among these
applications were those of the Griffin lessees.   Action on
them was suspended in accordance with the 1953 direc-
tive, but none was rejected on the ground that the land
in question was closed to leasing.[6]

On September 9, 1955, the Secretary issued Public
Land Order No. 1212, 20 Fed. Reg. 6795, revoking in its
entirety Public Land Order No. 487.   After granting
certain preferences, it provided:

> "6. Any of the lands described in paragraphs
> 4 (a), 4 (b) or 4 (d) of this order then remaining
> unappropriated, *shall become subject to* such appli-
> cation, petition, selection, or other form of appro-
> priation by the public generally as may be authorized
> by the public-land laws, *including the mineral-leas-
> ing laws* . . . .

> "7. Commencing at 10:00 a. m. on the 182nd day
> after the date of this order, any of the unsurveyed
> lands described in paragraph 4 (c) not settled upon
> by veterans or other persons entitled to credit

---

[5] See memorandum, February 15, 1954, Director, Bureau of Land
Management, to Assistant Secretary of the Interior; memorandum,
August 12, 1955, Director, Bureau of Land Management, to Area
Administrator, Area 4 (Alaska); 102 Cong. Rec. A6582.

[6] In his report for the fiscal year ending June 30, 1955, the Gov-
ernor of Alaska stated:

"Residents of Alaska and major oil companies have continued to
file lease applications and send exploratory parties into various parts
of the Territory.   The Kenai Moose Reserve on the Kenai Peninsula
is covered with 325 lease applications awaiting decision of the Sec-
retary of the Interior as to what stipulations for the protection of
wildlife should be inserted in leases, if they are issued."

Rep. Alaska Gov. 60–61 (1955); see also Rep. Secy. Int. 65 (1953).

8

for service *shall become subject to* settlement and other forms of appropriation by the public generally, *including leasing under the mineral-leasing laws* . . . ." (Emphasis added.)

Respondents make much of the italicized language, which does appear to be inconsistent with the Department's prior interpretation of Public Land Order No. 487 and its actual leasing practices. However, on October 14, 1955—35 days after it was promulgated but before it went into effect, and years before the respondents entered the picture—Public Land Order No. 1212 was amended to delete the references to the mineral-leasing laws. 20 Fed. Reg. 7904.

On December 8, 1955, the anticipated revision of the 1947 refuge-leasing regulation was promulgated. 20 Fed. Reg. 9009. It was more restrictive than the old regulation, and gave increased power to the Fish and Wildlife Service to approve or disapprove oil and gas development of refuges. It listed in an Appendix A a number of refuges (not including Kenai) in which, because of their importance to the preservation of rare species of plant and animal life, no leasing at all would be permitted. In Appendix B it listed certain areas (including a small part of the Moose Range not involved here) "with respect to which the Fish and Wildlife Service reports that oil and gas development might seriously impair or destroy the usefulness of the lands for wildlife conservation purposes . . . ." In such Appendix B areas, leasing was to be permitted only upon the approval by the Director of the Fish and Wildlife Service of "a complete and detailed operating program for the area." In all other wildlife areas the regulation provided that "[o]il and gas leases may be issued" provided they contain specified conditions requiring approval by the Fish and Wildlife Service of the type of prospecting to be conducted, and adoption by the

lessee of a unit plan approved by the Service. Respondents argue that even if it be assumed that (as is clearly the case) the 1955 regulation treated the lands in controversy as open to leasing, the regulation is not probative of the availability of the lands for leasing *prior to 1955,* and is therefore no evidence that the Secretary viewed the lands as open to leasing at the time the Griffin applications were filed. We think, however, that if the Secretary had been of the opinion that he was changing the status of that part of the Moose Range not covered by Appendix B, rather than merely imposing additional restrictions on leasing therein, he would have done so in terms more express than those used in the 1955 regulation. He did not refer to the Range as a whole; the only reference by name was to those parts of the Range which were specified in order to *except* them from the general provision that "[o]il and gas leases may be issued" in wildlife refuges. Though this specification supports the inference that the regulation was drafted on the assumption that the remainder of the Range was open to leasing, such indirect implication—however clearly it confirms the preexisting availability of the Range—would have been a technique inappropriate for effecting a *change* of the Range's status. Moreover, the President's 1952 delegation to the Secretary of power to make or modify withdrawals had directed that "[a]ll orders issued by the Secretary of the Interior under the authority of this order *shall be designated as public land orders* and shall be submitted . . . for filing and for publication in the FEDERAL REGISTER." Executive Order No. 10355, 17 Fed. Reg. 4831 (emphasis added). It may be that a document not labeled a public land order could in legal effect constitute an exercise of that power; however, if the Secretary had meant to exercise such power, it is likely that he would

10

have done so in the manner directed by the President's delegation.[7]

When bills were introduced in Congress early in 1956 to restrict oil and gas leasing in wildlife refuges, the House Committee on Merchant Marine and Fisheries and the Subcommittee on Merchant Marine and Fisheries of the Senate Committee on Interstate and Foreign Commerce held extensive hearings thereon. The bills as introduced only forbade the Secretary to "dispose of" lands in wildlife refuges, and the question arose during the hearings whether that language would apply to the issuance of oil and gas leases. A representative of the Department asserted, without contradiction, that the granting of an oil and gas lease was not a "disposition" and would not be affected by the language as proposed. Hearings before the House Committee on Merchant Marine and Fisheries on H. R. 5306, etc., 84th Cong., 2d Sess., p. 98. An amendment was accordingly proposed specifically restricting oil and gas leasing. Neither committee reported

---

[7] It appears that the Bureau regarded the amended regulations as automatically vacating the 1953 suspension order; however, upon the almost immediate introduction in Congress of bills further to restrict leasing in wildlife refuges, the field offices were directed once again to withhold final action on lease applications. See *Richard K. Todd et al.*, 68 I. D. 291, 298 (1961).

In further support of the claim that the 1955 regulation is worthless as an indication of the pre-existing status of the lands covered thereby, respondents urge that Appendix B listed "wildlife refuges which were closed by the terms of the orders creating them." However, of the 176 refuges listed in Appendix B, respondents point to only one: the Salt Plains in Oklahoma. Moreover, only a small part of the Salt Plains (543 acres out of over 30,000) was specifically withdrawn from appropriation under the mining and mineral-leasing laws. Public Land Order No. 144, 8 Fed. Reg. 9430. It is therefore doubtful that a simple listing in Appendix B of the "Salt Plains," large parts of which were admittedly open to leasing prior to 1955, was intended to open the small area closed by Public Land Order No. 144.

favorably on the bills. However, the House Committee submitted a report stating that it had been decided to try, for an experimental period of time, an arrangement whereby each proposed alienation or relinquishment of any interest the Fish and Wildlife Service had in lands under its jurisdiction would be submitted to the Committee, which would within 60 days approve or disapprove the action contemplated. H. R. Rep. No. 1941, 84th Cong., 2d Sess., pp. 12–13. This resolution of the issue suggests that the Committee accepted the Department's view that the Secretary had pre-existing authority to grant oil and gas leases in the Moose Range, and was concerned only with the way in which he exercised his discretion.

Pursuant to the agreement, the House Committee on Merchant Marine and Fisheries held public hearings on July 20 and 25, 1956, on a proposal from the Fish and Wildlife Service for the issuance of 30 oil and gas leases on 71,680 acres in the northern half of the Moose Range—located within the area encompassed by Executive Order No. 8979—for which lease applications had been filed in 1954 by *amicus curiae* Richfield Oil Corporation and others. The proposal contemplated that the leases would be subject to the Swanson River Unit plan of operation, which had been approved by the Bureau of Land Management, the Geological Survey and the Fish and Wildlife Service, all branches of the Department of the Interior. At the hearing on the proposal a spokesman for the National Wildlife Federation urged that Executive Order No. 8979 precluded the issuance of the leases. Transcript of Hearings before the House Committee on Merchant Marine and Fisheries, July 20 and 25, 1956, Lease of Portions of Kenai National Moose Range, pp. 17, 19, 24–26. But see *id.*, pp. 35–36; letter, July 24, 1956, Deputy Solicitor, Department of the Interior, to Hon. E. L.

Bartlett, Delegate to Congress from Alaska, following *id.,*
p. 30. On July 25, 1956, however, the Committee's Chair-
man advised the Director of the Fish and Wildlife Service
that the Committee unanimously had concluded that
issuance of the leases would not be detrimental to the
wildlife values of the Moose Range, and had concurred
in the proposal to issue the leases.[8]

Following the Committee's approval the leases were
issued, an exploratory well was drilled and oil was dis-
covered in commercial quantities in July 1957. See Rep.
Alaska Gov. 88 (1957); Rep. Secy. Int. 356 (1957); Rep.
Secy. Int. 104, 199, 258, 356 (1958). The Swanson River
leases soon became again a subject of congressional con-
cern, when the Secretary of the Interior—realizing that
although he had authority to issue leases on dry land, he
lacked such authority with respect to lands beneath
Alaskan inland navigable waters—asked Congress for
authority to issue leases on Alaskan water bottoms, and
to add to the leases already issued in Alaska and to appli-
cations pending there the water bottoms within their

---

[8] Respondents seek to capitalize on the fact that although the
Swanson River Unit was not located in any of the areas designated
in Appendix B of the 1955 regulation, the applicants submitted, and
obtained Service approval of, a detailed operating program for the
unit. There are at least two possible explanations for the submis-
sion of the plan. First, the Fish and Wildlife Service could at any
time designate areas not listed in Appendix B in which leasing "might
seriously impair or destroy" conservation purposes and accordingly
require advance approval of operating programs for them. Sub-
mission of a plan as to the Swanson River Unit might have been
regarded as a means of insuring that the Service would not so desig-
nate the area. Second, the Secretary had directed his subordinates
to withhold final action on lease applications pending a further re-
vision of the regulations. The applicants may have submitted the
plan in order to persuade the Department and the House Committee
that the proposed leasing was consistent not only with existing regu-
lations but also with any that were likely to be adopted.

boundaries.[9]  The Senate Committee reported favorably on the proposed bill, saying:

> "In Alaska, there is at the present time only one area which is now subject to the Mineral Leasing Act where oil and gas is known to exist in paying quantities, this being on the Kenai Peninsula as previously described.  If prior to the effective date of this act, the producing structure on the Kenai is defined, then the holders of upland leases in such areas might be forced to compete for areas beneath adjacent lakes and streams.  The committee felt that this result would work to the disadvantage of those lessees and developers who have gone ahead and developed this area . . . ."  S. Rep. No. 1720, 85th Cong., 2d Sess., p. 5.

The bill was subsequently enacted into law.  72 Stat. 322 (1958), 48 U. S. C. § 456 and 30 U. S. C. § 251 (1958 ed.).

Meanwhile, the controversy over the leasing policies to be followed in wildlife refuges was resolved by the adoption, on January 8, 1958, of another complete revision of the regulation.  23 Fed. Reg. 227, 43 CFR § 192.9.  The revision represented a near-total victory for the conservationists.  It altogether prohibited oil and gas leasing, unless necessary to prevent draining, in

---

[9] In the hearings before the Senate Committee on Interior and Insular Affairs on the proposed bill, Mr. Gordon Goodwin, attorney for *amicus curiae* Richfield Oil Corporation, testified:

"Well, we have pending, and have had for 2 or 3 or more years, applications for leases in the Kenai moose range, and a few leases were issued in there, and that is where the discovery was made.  But, shortly after that time, the Secretary suspended all leasing in the moose range . . . and he has never lifted it yet . . . .  So we have not been able to do much business up there except to a very limited extent."

Hearings before the Senate Committee on Interior and Insular Affairs on H. R. 8054, 85th Cong., 2d Sess., p. 77.

wildlife refuges—with two exceptions: lands withdrawn for a dual purpose, and wildlife refuges located in Alaska. As to lands falling within these two excepted categories, the Bureau of Land Management and the Fish and Wildlife Service were to reach agreements specifying the lands which "shall not be subject to oil and gas leasing" and to decide on provisions to be required in leases issued on the remaining lands. The agreements were to become effective upon approval by the Secretary and publication in the Federal Register. The regulation further provided that "[a]ll pending offers or applications heretofore filed for oil and gas leases covering game ranges, coordination lands, and Alaska wildlife areas, will continue to be suspended until the agreements referred to . . . shall have been completed," and that no new lease applications would "be accepted for filing until the tenth day after the agreements . . . are noted on the land office records."

Pursuant to the regulation, there was published in the Federal Register on August 2, 1958, an order of the Secretary announcing the agreement reached with respect to the Moose Range. 23 Fed. Reg. 5883. The order decreed that certain lands within the Range (essentially the southern half) "are hereby closed to oil and gas leasing because such activities would be incompatible with management thereof for wildlife purposes." It then provided:

"The balance of the lands within the Kenai National Moose Range are subject to the filing of oil and gas lease offers . . . . Offers to lease covering any of these lands which have been pending and upon which action was suspended in accordance with the regulation 43 CFR 192.9 (d) will now be acted upon and adjudicated in accordance with the regulations.

. . . . .

". . . [L]ease offers for lands which have not been excluded from leasing will not be accepted for filing until the tenth day after the agreement and map are noted on the records of the land office . . . ."[10]

The agreement was noted in the Anchorage land office on August 4, 1958, and 10 days later respondents filed their applications.

Soon after the issuance of the regulation and the implementing order, the pending applications were acted upon; within the next two months, 294 leases covering 621,234 acres were issued in the area subject to Executive Order No. 8979, in response to applications (including those of the Griffin lessees) filed in 1954 and 1955. When these figures are added to those covering leases issued prior to 1958 (primarily those in the Swanson River area), it appears that in the area subject to Executive Order No. 8979, the Secretary issued a total of 331 leases covering 696,680 acres on applications filed during the period the Court of Appeals held that the area was closed to leasing. Thus, prior to the commencement of the instant suit, the Secretary had leased substantially the entire area

---

[10] In announcing the order, the Secretary warned that there would be little land available to new applicants: "Most of these lands are now covered by applications that will be adjudicated under the regulations of the Department." Department of the Interior Press Release, July 25, 1958.

Respondents point to the fact that in a Press Release dated January 29, 1958, announcing the forthcoming (August) order, the Secretary had indicated that he was "opening" a part of the Moose Range to leasing. The choice of this term is wholly understandable in view of the facts that general instructions to local offices not to take final action on lease applications had been outstanding since 1953, and that the regulations of January 8, 1958, had provided that no new applications would be accepted for filing until a subsequent order was issued specifying the lands which would not be subject to leasing. Therefore, the order of August 2, 1958, did, in these two senses, "open" the Range to leasing.

16

in controversy;[11] the Solicitor General further assures us that the lessees and their assignees had, in turn, expended tens of millions of dollars in the development of the leases.

II.

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Comm'n* v. *Aragon,* 329 U. S. 143, 153. See also, *e. g., Gray* v. *Powell,* 314 U. S. 402; *Universal Battery Co.* v. *United States,* 281 U. S. 580, 583. "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' " *Power Reactor Co.* v. *Electricians,* 367 U. S. 396, 408. When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.

> "Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. . . . [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless

---

[11] In the area excepted from Executive Order No. 8979 but encompassed by Public Land Order No. 487, the total number of leases issued on applications filed before the revocation of the latter order was 74 covering 116,878 acres.

it is plainly erroneous or inconsistent with the regulation." *Bowles* v. *Seminole Rock Co.,* 325 U. S. 410, 413–414.

In the instant case, there is no statutory limitation involved. While Executive Order No. 8979 was issued by the President, he soon delegated to the Secretary full power to withdraw lands or to modify or revoke any existing withdrawals. See Executive Order No. 9146, 7 Fed. Reg. 3067; Executive Order No. 9337, 8 Fed. Reg. 5516; Executive Order No. 10355, 17 Fed. Reg. 4831. Public Land Order No. 487 was issued by the Secretary himself.

Moreover, as the discussion in Section I of this opinion demonstrates, the Secretary has consistently construed Executive Order No. 8979 and Public Land Order No. 487 not to bar oil and gas leases.

> "It may be argued that while these facts and rulings prove a usage they do not establish its validity. But government is a practical affair intended for practical men. Both officers, law-makers and citizens naturally adjust themselves to any long-continued action of the Executive Department—on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle but the basis of a wise and quieting rule that in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself—even when the validity of the practice is the subject of investigation." *United States* v. *Midwest Oil Co.,* 236 U. S. 459, 472–473.

The Secretary's interpretation had, long prior to respondents' applications, been a matter of public record and discussion. The agreement worked out with the House Committee on Merchant Marine and Fisheries in 1956, and the approval of the Swanson River leases pursuant thereto,

18

though probably constituting no "legislative ratification" in any formal sense,[12] serve to demonstrate the notoriety of the Secretary's construction, and thereby defeat any possible claim of detrimental reliance upon another interpretation. Finally, almost the entire area covered by the orders in issue has been developed, at very great expense, in reliance upon the Secretary's interpretation. In *McLaren* v. *Fleischer,* 256 U. S. 477, 480–481, it was held:

"In the practical administration of the act the officers of the land department have adopted and given effect to the latter view. They adopted it before the present controversy arose or was thought of, and, except for a departure soon reconsidered and corrected, they have adhered to and followed it ever since. Many outstanding titles are based upon it and much can be said in support of it. If not the only reasonable construction of the act, it is at least an admissible one. It therefore comes within the rule that the practical construction given to an act of Congress, fairly susceptible of different constructions, by those charged with the duty of executing it is entitled to great respect and, if acted upon for a number of years, will not be disturbed except for cogent reasons."

If, therefore, the Secretary's interpretation is not unreasonable, if the language of the orders bears his construction, we must reverse the decision of the Court of Appeals.[13]

---

[12] See *Ex parte Endo,* 323 U. S. 283, 303, n. 24; *Boesche* v. *Udall,* 373 U. S. 472, 482–483; cf. *Peters* v. *Hobby,* 349 U. S. 331, 345; but cf. *Brooks* v. *Dewar,* 313 U. S. 354, 360–361.

[13] The failure of the court below to attach proper significance to the administrative practice seems to be attributable to the fact that it was misinformed concerning that practice. The respondents' brief in the Court of Appeals stated that "[n]o leases issued for any lands within the Kenai Range between 1941 and 1958" (p. 30), and that "[t]he discovery as well as the increased activity were in areas of the Peninsula outside of the Kenai National Moose Range" (p. 40).

### III.

Executive Order No. 8979, 6 Fed. Reg. 6471, provided:

"None of the above-described lands excepting [a described area] shall be subject to settlement, location, sale, or entry, or other disposition (except for fish trap sites) under any of the public-land laws applicable to Alaska, or to classification and lease under the provisions of the act of July 3, 1926, entitled 'An Act to provide for the leasing of public lands in Alaska for fur farming, and for other purposes', 44 Stat. 821, U. S. C., title 48, secs. 360–361, or the act of March 4, 1927, entitled 'An Act to provide for the protection, development, and utilization of the public lands in Alaska by establishing an adequate system for grazing livestock thereon', 44 Stat. 1452, U. S. C., title 48, secs. 471–471o . . . ."

"Settlement," "location," "sale" and "entry" are all terms contemplating transfer of title to the lands in question. It was therefore reasonable for the Secretary to construe "or other disposition" to encompass only dispositions which, like the four enumerated, convey or lead to the conveyance of the title of the United States—for example, "grants" and "allotments." Cf. Opinion of the Solicitor, 48 I. D. 459 (1921).[14] An oil and gas lease does not vest title to the lands in the lessee. See *Boesche* v. *Udall*, 373 U. S. 472, 477–478. Moreover, the term "public-land laws" is ordinarily used to refer to statutes governing the alienation of public land, and generally is distinguished from both "mining laws," referring to statutes governing the mining of hard minerals on public lands, and "mineral leasing laws," a term used to designate that group of statutes governing the leasing of public

---

[14] This view is taken in Hoffman, Oil and Gas Leasing on the Public Domain, p. 33 (1951).

lands for gas and oil. Compare Title 43 U. S. C., Public Lands, with Title 30 U. S. C., Mineral Lands and Mining.[15]

The reference in Executive Order No. 8979 to the 1926 and 1927 statutes also lends support to the Secretary's interpretation. For both statutes relate to leasing rather than alienation of title; it would be reasonable to infer from their specific addition that "disposition" was not intended to encompass leasing.[16] The Secretary also might reasonably have been influenced by a belief that in view of his overriding discretionary authority to refuse to issue an oil and gas lease on a given tract whenever he thought that granting a lease would undercut the purposes of the withdrawal, inclusion of such leases in the withdrawal order would have been unnecessary. Cf. *Haley* v. *Seaton,* 108 U. S. App. D. C. 257, 281 F. 2d 620 (1960).

---

[15] Reference to the language of other withdrawal orders is not very fruitful. *Amici curiae* list 173 Executive and Public Land Orders issued between 1940 and 1952 which contained language expressly barring mineral leasing. Brief for Marathon Oil Co. and Union Oil Co. of California as *amici curiae,* pp. 6A–7A. However, respondents list 146 orders issued between 1936 and 1959 expressly permitting mineral leasing. Brief for Respondents, pp. 7a–10a.

[16] The Court of Appeals sought to explain the reference to the 1926 and 1927 Acts by construing the phrase "any of the public-land laws applicable to Alaska" to mean laws applicable both throughout the country and in Alaska, and opined that the 1926 and 1927 Acts were specifically added because they had application only in Alaska. However, the Secretary's interpretation of "any of the public-land laws applicable to Alaska" (as including, *inter alia,* laws relating to public lands located only in Alaska) is at least as natural as the Court of Appeals' interpretation (limiting the phrase to laws applicable throughout the country) and is beyond cavil a "reasonable" interpretation, which is the test the Court of Appeals should have been applying. Moreover, the Court of Appeals' conclusion that "disposition" was meant to include leasing renders the words "or to classification and lease," initiating the reference to the Acts of 1926 and 1927, superfluous.

Respondents' reliance upon *Wilbur* v. *United States ex rel. Barton,* 60 App. D. C. 11, 46 F. 2d 217 (1930), aff'd *sub nom. United States ex rel. McLennan* v. *Wilbur,* 283 U. S. 414, is misplaced. Involved in *Wilbur* was the meaning of language contained in the Pickett Act, 36 Stat. 847 (1910), 43 U. S. C. § 141 (1958 ed.).

> "[T]he President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States including the District of Alaska . . . ."

It is true that the Court of Appeals for the District of Columbia Circuit squarely held this language to be sufficient to authorize withdrawals from oil and gas leasing. Moreover, this Court affirmed, albeit on an alternative theory: that the Mineral Leasing Act merely authorized and did not compel the issuance of prospecting permits. 283 U. S., at 419. However, a word of history will place *Wilbur* in context and thereby demonstrate its irrelevance to the problem here. Prior to 1920, oil and gas rights in public lands were acquired in the same way as rights in other minerals—by a form of "location." One staked out a location and prospected for oil or other minerals; upon making a discovery, he became entitled to a patent to the land as well as the minerals. In 1909, responding to rapid reserve depletion in certain areas, the Interior Department issued an order pursuant to Presidential authorization:

> "In aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain, all public lands in [a defined area of over 3 million acres in California and Wyoming] are hereby temporarily withdrawn from all forms of location, settlement, selection, filing, entry, or disposal under the mineral or nonmineral public land

laws. . . ." U. S. Geological Survey, Bull. 623, H. R. Doc. No. 868, 64th Cong., 1st Sess., 135 (1916); quoted, 236 U. S., at 467.

The power of the executive to make the withdrawal was upheld by this Court in 1915 in *United States* v. *Midwest Oil Co.*, 236 U. S. 459. In the meantime, however, Congress had, pursuant to the President's request, sought to remove all doubts about the legality of such orders by granting to him, in the Pickett Act, discretionary authority to withdraw public lands from "settlement, location, sale, or entry."

The Mineral Leasing Act of 1920 changed the procedure for acquiring oil and gas rights in public lands: the Secretary was empowered to issue prospecting permits and required, in the event a discovery was made under the permit, to issue a lease which entitled the lessee to extract the mineral, but gave him no right in the land itself.[17] From 1920 on, therefore, the language of the Pickett Act no longer technically encompassed leasing. Nonetheless, it was clear that the Act had been specifically designed to legitimize orders like the 1909 withdrawal order. The Court of Appeals reasonably concluded in *Wilbur* that the fact that Congress had in 1920 changed the procedure— from "location" to "leasing"—for acquisition of oil and gas rights afforded no reason for concluding that they had thereby intended to cut back the power granted in 1910. 60 App. D. C., at 14–15, 46 F. 2d, at 220–221. Thus neither that holding by the Court of Appeals nor this Court's affirmance in any way casts doubt upon the reasonableness of the Secretary's interpretation of the orders at bar, which were drafted long after the Mineral Leasing

---

[17] In 1935, the prospecting permit procedure was eliminated and the present direct leasing procedure substituted. Act of August 21, 1935, 49 Stat. 676–677, 30 U. S. C. §§ 223, 226 (1958 ed.).

Act had done away with location as a means of acquiring oil and gas rights.

The placement of the fish trap exception—"(except for fish trap sites)"—a phrase admittedly not relating to alienation of title to land, does tend to cut against the Secretary's interpretation of Executive Order No. 8979. However, it appears that the exception was designed to assure the Alaskans, whose livelihood is largely dependent on the salmon catch, that they could continue—despite the order—to use fish traps. Cf. *Organized Village of Kake* v. *Egan,* 369 U. S. 60. Since it was a reassurance not technically necessary and therefore not functionally related to any part of the regulation, it is no surprise to find it carelessly placed. Compare Executive Order No. 8857, 6 Fed. Reg. 4287, establishing the Kodiak National Wildlife Refuge. We do not think the position of the fish trap exception is sufficient to justify a court's overturning the Secretary's construction as unreasonable.

Public Land Order No. 487 withdrew the lands it covered from "settlement, location, sale or entry," but contained no reference to "other disposition." Nor did it contain anything analogous to the fish trap exception. The reasonableness of the Secretary's interpretation of Public Land Order No. 487 therefore follows *a fortiori* from the reasonableness of his construction of Executive Order No. 8979.

*Reversed.*

MR. JUSTICE DOUGLAS and MR. JUSTICE HARLAN took no part in the decision of this case.