**SOUTHEASTERN HUMAN DEVELOPMENT CORPORATION, a non-profit South Dakota corporation, Plaintiff,**

v.

**Richard S. SCHWEIKER, Secretary of the Department of Health and Human Services, an agency of the United States of America; Robert L. Trachtenberg, Acting Director of the Office of Community Services of the Department of Health and Human Services; United States of America; William J. Janklow, Governor of the State of South Dakota; and South Dakota State Planning Bureau; and Dana Nelson, Defendants.**

**Civ. No. 81–3072.**

United States District Court, D. South Dakota, Central Division.

Jan. 18, 1982.

Jeff P. Masten, Canton, S. D., for plaintiff.

Dawn R. Bowen, Asst. U. S. Atty., Pierre, S. D., for federal defendants.

Jeffrey P. Hallem, Asst. Atty. Gen., Pierre, S. D., for defendant State of South Dakota.

Wayne F. Gilbert, Gunderson, Farrar, Aldrich, Warder & DeMersseman, Rapid City, S. D., for intervenor, Western South Dakota Community Action, Inc.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

### CASE SUMMARY

Plaintiff brought this action seeking an injunction enjoining defendants from disbursing or expending the allotment available to the State of South Dakota under Subtitle B–Community Service Block Grant Program of the Omnibus Budget Reconciliation Act of 1981. On December 23, 1981, following a hearing in which all parties appeared by counsel, this Court granted a temporary restraining order to preserve the status quo until a hearing on plaintiffs' motion for a preliminary injunction could be held. The federal defendants have moved to dismiss the complaint on the ground that plaintiff lacks the requisite standing. In addition, both the federal defendants and state defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted. The Court heard the motion for preliminary injunction on January 13, 1982.[1] For the reasons which follow, plaintiff's motion for a preliminary injunction is denied.

### FACTUAL BACKGROUND

The Omnibus Budget Reconciliation Act of 1981 (The Reconciliation Act) among other things, established seven block grant programs to be administered by the Secretary of the Department of Health and Human Services. The block grants replaced a large number of programs previously administered by the federal government, transferred primary responsibility for their administration to the states, and conferred substantial discretion on the state as to use of the block grant funds. The Reconciliation Act repealed most of the Economic Opportunity Act of 1964, 42 U.S.C. § 2701 *et seq.*, and abolished the Community Services Administration, (CSA), the federal agency which had been responsible for administering the anti-poverty, categorical grant programs authorized by the Economic Opportunity Act.

Prior to August 13, 1981, when the Reconciliation Act became law, Plaintiff was receiving funds from the CSA as an eligible grantee under the Economic Opportunity Act of 1964. Because of its grantee status under the old law, plaintiff is an "eligible entity" under the Community Services Block Grant (CSBG) Program[2] established by the Reconciliation Act.

Beginning in fiscal year 1983, CSBG funds will be available only through state block grant programs, with certain limited exceptions not relevant here. For fiscal year 1982 only, transition provisions of the Reconciliation Act permit a state to elect to administer the CSBG program, or to request that the Secretary of the Department of Health and Human Services (HHS) administer the block grant.[3] If a state chooses not to administer the block grant program, the state's allotment for fiscal year 1982 is administered by the Secretary in accordance with the relevant repealed provisions of the Economic Opportunity Act of 1964.[4] If a state chooses to administer the block grant program, it must submit an application containing specified assurances and a plan describing how the state will

---

1. On January 12, 1982, Western South Dakota Community Action, Inc. filed a Motion to Intervene, which was denied at the hearing on plaintiff's request for a preliminary injunction.

2. Title VI, Subtitle B—Omnibus Budget Reconciliation Act of 1981, Pub.L.No. 97–35. The

term "eligible entity" is defined at § 673(1) of the Act.

3. *See* § 682 set forth in Appendix A.

4. *See* § 682(2)(b)(1) set forth in Appendix A.

carry out the assurances.[5] In addition, states are required to prepare a public report on the proposed use of block grant funds.[6]

On September 2, 1981, the Governor of South Dakota notified the Secretary of HHS, in writing, that South Dakota elected to administer the CSBG effective October 1, 1981, the beginning of the federal fiscal year for 1982. The State, however, did not submit its plan containing the requisite assurances until December 11, 1981.

On December 17, 1981, plaintiff filed a motion for temporary restraining order, seeking to enjoin the defendants from disbursing any CSBG funds to South Dakota for fiscal year 1982, alleging that the state defendants failed to timely file its plan containing the requisite assurances in violation of § 1743(a).[7]

### DISCUSSION

### I. TIME REQUIREMENT FOR SUBMISSION OF STATE PLAN

Plaintiff contends that once the State informed the Secretary of its intent to administer the CSBG, it was bound to follow the timetable set forth in § 1743(a),[8] and further until the State complied with § 1743(a), the Secretary was bound to follow the terms of § 1743(b).[9] Specifically, plaintiff contends that the State did not submit its plan and the requisite assurances in time to be eligible to receive CSBG funding for the first two quarters of fiscal year 1982. As a result, plaintiff contends that the Secretary must distribute the two quarters' funding to those entities in the state, such as the plaintiff, that were receiving funds under the Economic Opportunity Act of 1964.

It is the position of both the federal and state defendants that although the provisions of Title XVII upon which the plaintiff relies are general provisions applicable to all block grant programs created by the Reconciliation Act, the more specific provisions of Title VI, under which the CSBG program is authorized, are controlling in the instant situation. In short, the defendants contend that once the State notified HHS of the state's election to administer the CSBG the specific block grant provisions of Title VI and not the general transition provisions of Title XVII went into effect as to South Dakota for fiscal year 1982.

■ As stated in *Dataphase Systems, Inc. v. C. L. Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) whether a preliminary injunction should issue involves a consideration of (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. Because the case at bar essentially involves a legal question of statutory interpretation, the Court's discussion will focus on the third factor above, i.e., the probability of plaintiff's success on the merits.

■ Upon reviewing the legislative history of Titles VI and XVII, and applying the rules of statutory construction, the Court agrees with the statutory interpretation urged by the defendant. With respect to the transition provisions of Title XVII, the Conference Committee noted that, "[a]ny transition provision contained in a block grant program authorized by this Act shall supersede this [Title]." H.R.Rep.No. 97–208, 97th Cong., 1st Session 923 (1981), U.S. Code Cong. & Admin.News, pp. ——, ——. The transition provisions for the CSBG Program are found in § 682. As discussed *supra*, § 682 permits a state to choose, for fiscal year 1982 only, to administer the block grant or to request the Secretary to

---

5. *See* § 675 set forth in Appendix B.

6. *See* § 1742(a) & (b) set forth in Appendix C.

7. Plaintiff also contends that the Reconciliation Act required a state public hearing before any

fiscal 1982 CSBG funds could be distributed to South Dakota. This point is discussed *infra*.

8. *See* Appendix D.

9. *See* Appendix D.

administer the block grant. Although the bulk of the provisions in § 682 pertain only to the instance, unlike the case at bar, in which a state elects not to administer the block grant, the specific provisions of Title VI, particularly § 675, are also applicable here and must prevail over the general transition provisions of § 1743. In reaching this interpretation, the Court is cognizant of the well-established rule of statutory construction that specific provisions prevail over general provisions in the same statute which might otherwise be controlling. *See, e.g., Fourco Glass Co. v. Transmirra Production Corp.,* 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957); *Ginsberg & Sons, Inc. v. Popkin,* 285 U.S. 204, 52 S.Ct. 322, 76 L.Ed. 704 (1932); and *Hickman v. Cliff Peck Chevrolet, Inc.,* 566 F.2d 44 (8th Cir. 1977).

Section 675(a) provides that a state desiring to receive an allotment must submit an application containing the assurances enumerated in § 675(c). There is no specific timetable in § 675 within which a state must do so. The application procedure is simply a prerequisite to receiving CSBG funds. The Secretary is prohibited from prescribing "the manner in which the states will comply with the provisions of [§ 675(c)]". The legislative history also indicates that Congress expected the application process to be very simple. That view was clearly expressed in the Senate,[10] where the CSBG program originated, by the following passage from the Senate Report:

> The Committee's bills are meant to be definitive with regard to paperwork, reports, and accountability. The Secretary is specifically directed not to interpret these requirements by regulation or otherwise go beyond the explicit boundaries of the limited federal role clearly defined in the bill. For example, the Committee intends that the application be extremely simple. The Secretary should submit to the States an application that plainly lists the assurances required in the statute.

The Governor should be required only to sign and date the application and return it to the Secretary.

S.Rep. No. 97–139, 97th Cong., 1st Session 908 (1981), U.S.Code Cong. & Admin. News at 932. In discussing the requirement of § 675(d)(1) that a state submit, in addition to its application, a plan describing how it will carry out the assurances contained in subsection (c), the Senate Report stated:

> The requirement that the Governor prepare a plan is designed to assure that the general public within a state, and secondarily the Secretary, have a description of how the state plans to carry out the assurances contained in the application. The Committee intends that the plan be a description of a reasonable means of carrying out the assurances. No provision for secretarial approval is provided or intended, and no elaborate plans are contemplated, except when a state on its own initiative chooses to have one. Under no circumstances does the Committee want the Secretary to make normative judgments about a plan. Ultimately, the plan requirement is to create a public record, but one which is to be fluid to reflect changes in the state's needs and attitudes. Accordingly, the Governor may alter his State's plan at any time, and the deficiencies in a plan cannot, by itself, be utilized as a basis for withholding of a state's funds.

*Id.*

It is clear from the legislative history that Congress intended that states be able to take over the CSBG program with a minimum of federal involvement and under a relatively simple scheme of transition. With this in mind, it is consistent that Congress did not intend to impose a deadline or timetable within which a state must apply for CSBG funds. In order to facilitate transition, however, and carry out the congressional intent that states qualify for the block grant funds as soon as possible,

---

**10.** The Community Services Block Grant originated in the Senate, and the Conference Report indicates that the House substantially accepted the Senate version of the bill, except as to amendments immaterial here.

§ 682(b) does require states to notify the Secretary prior to October 1, 1982, if they do *not* intend to administer the block grant for the first quarter of fiscal year 1982. Similar notice is required thirty days prior to the beginning of each subsequent quarter. This deadline for notification, however, does not establish a corresponding timetable within which a state must submit its application and plan. The Reconciliation Act itself supports this interpretation by permitting the chief executive of a state to submit revised plans (§ 675(d)(1)), and by providing that a state may spend its allotment in the fiscal year it receives the allotment "or in the succeeding fiscal year" (§ 678(b)).

The State of South Dakota timely notified the Secretary on September 2, 1981, of its intent to operate the CSBG. Upon receipt of that notice, the Secretary was without authority to distribute the CSBG funds under the provisions relied upon by the plaintiff. The State submitted its block grant plan on December 11, 1981, and the Regional Administrator of the Department of Health and Human Services approved the plan on December 14, 1981.[11] The State was then in full compliance with all of the conditions of the Reconciliation Act, and thus eligible to receive its allotment of CSBG funds for fiscal year 1982.[12]

The Court finds from the legislative history of the Reconciliation Act, and from an application of the rules of statutory construction, that the specific provisions of Title VI supersede and control the general provisions of Title XVII relied upon by the plaintiff. As a result, the transition provi-

sions of § 1743(a) & (b) are not relevant to the case at bar. For that reason, plaintiff has failed to state a claim upon which relief can be granted. The Court will, however, also address the plaintiff's contention regarding the public hearing requirement.

## II

### *Public Hearing Requirement*

■ Plaintiff also contends that the state failed to comply with the public hearing requirement of § 1742(c) which provides:

(c) No state may receive block grant funds for any fiscal year until the state has conducted a public hearing, after adequate public notice, on the use and distribution of the funds proposed by the State as set forth in the report prepared pursuant to subsection (a) with respect to that fiscal year.

Although § 1742(c), by its terms, applies to fiscal year 1982, § 675(b) makes no provision for a public hearing concerning fiscal year 1982 but does require public hearings by the state legislature for each succeeding fiscal year. For the same reasons stated *supra*, in holding that the specific provisions of Title VI prevail over the general provisions of Title XVII, the Court finds that § 675(b) governs fiscal year 1982.

The exemption from the public hearing requirement for fiscal year 1982 is consistent with the limitations Congress imposed on the use of funds during that first fiscal year. Section 675(c)(2)(A)(i) provides that for fiscal year 1982 only, not less than ninety per cent of the funds allotted to the state must be used to fund existing community

---

11. On December 17, 1981, the State made a public filing of its plan to satisfy the public inspection requirement of § 675(d)(2) and § 1742(b). Plaintiff contends that the State's plan was approved without benefit of public comment. There is nothing in the Reconciliation Act, nor its legislative history, that would preclude the Secretary from approving a state's plan for fiscal 1982 prior to the plan being made available for public inspection. Further, it must be remembered that a State may revise its plan once it has been approved. Presumably, a state could revise its plan after comments are received from interested local governments and persons.

12. It appears that the State of South Dakota did not actually submit to the Secretary of HHS an application containing specified assurances, as required by § 675(a) & (c). The State's plan submitted on December 11, 1981, however, does contain provisions describing how the State will carry out the assurances contained in subsection (c) and also contains a report on the proposed use of funds, as required by § 1742(a). This procedure was approved by the Secretary of HHS. The Court concludes that the State substantially complied with the statutory requirements.

action agencies. This provision assures that special consideration will be given to each existing community action agency, and thus serves many of the same purposes that a public hearing would serve. The parties agree there are but six local or regional community action agencies in South Dakota, of which plaintiff is one, that are eligible for fiscal 1982 funds.

In addition, the Secretary of Health and Human Services has adopted the view that a public hearing is not required for fiscal year 1982. The Secretary expressed this interpretation in a letter to the Governor of South Dakota dated August 21, 1981. Furthermore, the Secretary has adopted this interpretation in connection with the regulations issued to implement the block grant program.[13] The doctrine of construction which counsels deference to the interpretation given a statute by the agency charged with its administration is applicable in the instant case. The Eighth Circuit Court of Appeals recently discussed this rule of statutory construction in *Blue Cross Association v. Harris*, 622 F.2d 972, 978 (8th Cir. 1980) and quoted the following language from the Supreme Court case of *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965):

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." * * "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion,

of making the parts work efficiently and smoothly while they are yet untried and new.' "

*Id.* at 16, 85 S.Ct. at 801 (citations omitted).

Although there may be more than one possible interpretation of the specific provisions of Title VI and the general provisions of Title XVII, the Secretary's interpretation, in this Court's view, is reasonable and is entitled to considerable deference.

The Court concludes that no public hearing is required for fiscal year 1982. Plaintiff has failed to state a claim upon which relief can be granted. The motions to dismiss submitted by both the federal and state defendants are hereby GRANTED, and plaintiff's motion for a preliminary injunction is DENIED.

## APPENDIX A

SEC. 682.(a)(1) The purpose of this section is to permit, for fiscal year 1982 only, States to choose to operate programs under the block grant established by this subtitle or to have the Secretary operate programs under the provisions of law repealed by section 683(a).

(2) The Secretary shall carry out the provisions of this section through the Office of Community Services established in section 676(a).

(b)(1) Notwithstanding the provisions of section 683(a) or any other provision of law, a State may, for fiscal year 1982 only, make a determination that the State chooses not to operate programs under the block grant established by this subtitle. If the State makes such a determination, the State's allotment under section 674 shall be used within the State by the Secretary to carry out programs (in accordance with paragraph (4)) under the provisions of law in effect on September 30, 1981, but repealed by section 683(a).

---

**13.** 46 Fed.Reg. 48583, October 1, 1981. The preamble to the regulation states:

> No hearings are required for a state to receive its first year's allotments. Although Section 1742(c) of the Act establishes a general requirement for public hearings during

> the first year for block grants, that provision is superseded by the specific provisions elsewhere in the Act exempting the first year from the requirement for a public hearing. *Id.*

(2) The provisions of paragraph (1) apply to the provisions of law referred to in such paragraph, regardless of whether there is a specific termination provision or other provision of law repealing or otherwise terminating any program subject to this Act.

(3) Each State which, pursuant to paragraph (1), determines to have the Secretary operate programs under the provisions of law in effect on September 30, 1981, but repealed by section 683(a), shall give notice to the Secretary of such determination. Such notice shall be submitted to the Secretary prior to the beginning of the first quarter of fiscal year 1982 and at least 30 days before the beginning of any other quarter during the fiscal year. For purposes of this section, the quarters for fiscal year 1982 shall commence on October 1, January 1, April 1, and July 1 of fiscal year 1982.

(4) In any case in which the Secretary carries out programs under paragraph (1), the Secretary shall provide for the carrying out of such programs by making grants for such purpose to eligible entities (as defined in section 673(1)).

(c) The Secretary shall provide such assistance to the States as the States may require in order to carry out the provisions of this section.

(d) The Secretary may reserve not more than 5 percent of any State's allotment for administration of such State's programs under the block grant established by this subtitle, if such State has made a determination that the State chooses not to operate programs under the block grant established by this subtitle, and the Secretary is carrying out such State's programs under the provisions of law in effect on September 30, 1981.

(e) Upon the enactment of this Act, the Director of the Office of Management and Budget is authorized to provide for termination of the affairs of the Community Services Administration. He shall provide for the transfer or other disposition of personnel, assets, liabilities, grants, contracts, property, records, and unexpended balances of appropriations, authorizations, allocations, and other funds held, used, arising from, available to, or to be made available in connection with implementation of the authorities terminated by section 683(a) as necessary to effectuate the purposes of this subtitle.

## APPENDIX B

SEC. 675.(a) Each State desiring to receive an allotment for a fiscal year under this subtitle shall submit an application to the Secretary. Each such application shall be in such form as the Secretary shall require. Each such application shall contain assurances by the chief executive officer of the State that the State will comply with subsection (b) and will meet the conditions enumerated in subsection (c).

(b) After the expiration of the first fiscal year in which a State received funds under this subtitle, no funds shall be allotted to such State for any fiscal year under this subtitle unless the legislature of the State conducts public hearings on the proposed use and distribution of funds to be provided under this subtitle for such fiscal year.

(c) As part of the annual application required by subsection (a), the chief executive officer of each State shall certify that the State agrees to—

(1) use the funds available under this subtitle—(A) to provide a range of services and activities having a measurable and potentially major impact on causes of poverty in the community or those areas of the community where poverty is a particularly acute problem;

(B) to provide activities designed to assist low-income participants including the elderly poor—

(i) to secure and retain meaningful employment;

(ii) to attain an adequate education;

(iii) to make better use of available income;

(iv) to obtain and maintain adequate housing and a suitable living environment;

(v) to obtain emergency assistance through loans or grants to meet immediate and urgent individual and family needs, including the need for health services, nutritious food, housing, and employment-related assistance;

(vi) to remove obstacles and solve problems which block the achievement of self-sufficiency;

(vii) to achieve greater participation in the affairs of the community; and

(viii) to make more effective use of other programs related to the purposes of this subtitle;

(C) to provide on an emergency basis for the provision of such supplies and services, nutritious foodstuffs, and related services, as may be necessary to counteract conditions of starvation and malnutrition among the poor;

(D) to coordinate and establish linkages between governmental and other social services programs to assure the effective delivery of such services to low-income individuals; and

(E) to encourage the use of entities in the private sector of the community in efforts to ameliorate poverty in the community;

(2)(A)(i) use, for fiscal year 1982 only, not less than 90 percent of the funds allotted to the State under section 674 to make grants to use for the purposes described in clause (1) to eligible entities (as defined in section 673(1)) or to organizations serving seasonal or migrant farmworkers; and

(ii) use, for fiscal year 1983 and for each subsequent fiscal year, not less than 90 percent of the funds allotted to the State under section 674 to make grants to political subdivisions of the State for the political subdivisions to use for the purposes described in clause (1) directly or to nonprofit private community organizations which have a board which meets the requirements of clause (3), or to migrant and seasonal farm worker organizations; and

(B) provide assurances that the State will not expend more than 5 percent of its allotment under section 674 for administrative expenses at the State level;

(3) provide assurances that, in the case of a community action agency or nonprofit private organization, each board will be constituted so as to assure that (A) one-third of the members of the board are elected public officials, currently holding office, or their representatives, except that if the number of elected officials reasonably available and willing to serve is less than one-third of the membership of the board, membership of the board of appointive public officials may be counted in meeting such one-third requirement; (B) at least one-third of the members are persons chosen in accordance with democratic selection procedures adequate to assure that they are representative of the poor in the area served; and (C) the remainder of the members are officials or members of business, industry, labor, religious, welfare, education, or other major groups and interests in the community;

(4) give special consideration in the designation of local community action agencies under this subtitle to any community action agency which is receiving funds under any Federal antipoverty program on the date of the enactment of this Act, except that (A) the State shall, before giving such special consideration, determine that the agency involved meets program and fiscal requirements established by the State; and (B) if there is no such agency because of any change in the assistance furnished to programs for economically disadvantaged persons, the State shall give special consideration in the designation of community action agencies to any successor agency which is operated in substantially the same manner as the predecessor agency which did receive funds in the fiscal year preceding the fiscal year for which the determination is made;

(5) provide assurances that the State may transfer funds, but not to exceed 5 percent of its allotment under section 674, for the provisions set forth in this subtitle to services under the Older Americans Act of 1965, the Head Start program under sub-chapter B of chapter 8 of subtitle A of this title, or the energy crisis intervention program under title XXVI of this Act (relating to low-income home energy assistance);

(6) prohibit any political activities in accordance with subsection (e);

(7) prohibit any activities to provide voters and prospective voters with transportation to the polls or provide similar assistance in connection with an election or any voter registration activity;

(8) provide for coordination between antipoverty programs in each community, where appropriate, with emergency energy crisis intervention programs under title XXVI of this Act (relating to low-income home energy assistance) conducted in such community;

(9) provide that fiscal control and fund accounting procedures will be established as may be necessary to assure the proper disbursal of and accounting for Federal funds paid to the State under this subtitle, including procedures for monitoring the assistance provided under this subtitle, and provide that at least every year each State shall prepare, in accordance with subsection (f), an audit of its expenditures of amounts received under this subtitle and amounts transferred to carry out the purposes of this subtitle; and

(10) permit and cooperate with Federal investigations undertaken in accordance with section 679.

The Secretary may not prescribe the manner in which the States will comply with the provisions of this subsection.

(d)(1) In addition to the requirements of subsection (c), the chief executive officer of each State shall prepare and furnish to the Secretary a plan which contains provisions describing how the State will carry out the assurances contained in subsection (c). The chief executive officer of each State may revise any plan prepared under this paragraph and shall furnish the revised plan to the Secretary.

(2) Each plan prepared under paragraph (1) shall be made available for public inspection within the State in such a manner as will facilitate review of, and comment on, the plan.

## APPENDIX C

SEC. 1742.(a) Each State shall prepare a report on the proposed use of block grant funds received by that State, including (1) a statement of goals and objectives, (2) information on the types of activities to be supported, geographic areas to be served, and categories to characteristics of individuals to be served, and (3) the criteria and method established for the distribution of the funds, including details on how the distribution of funds will be targeted on the basis of need to achieve the purposes of the block grant funds. Beginning in the fiscal year 1983, the report required by this subsection shall include a description of how the State has met the goals, objectives, and needs in the use of funds for the previous fiscal year as identified in the report prepared pursuant to this subsection for that previous fiscal year.

(b) The report prepared by a State pursuant to subsection (a), and any changes in such report, shall be made public within the State on a timely basis and in such manner as to facilitate comments from interested local governments and persons.

(c) No State may receive block grant funds for any fiscal year until the State has conducted a public hearing, after adequate public notice, on the use and distribution of the funds proposed by the State as set forth in the report prepared pursuant to subsection (a) with respect to that fiscal year.

## APPENDIX D

SEC. 1743.(a) In the fiscal year 1982 only, each State shall certify to the responsible Federal agency that it is in compliance with section 1742 and that it is prepared to use all or part of available block grant funds. Such certifications shall be submitted to the responsible Federal agency prior to the beginning of the first quarter of the fiscal year 1982 or at least 30 days before the beginning of any other quarter of that fiscal year. For purposes of this section, the quarters for the fiscal year 1982 shall commence on October 1, January 1, April 1, and July 1 of the fiscal year 1982.

(b) Except as otherwise provided in this Act, until such time as the responsible Federal agency receives a certification from a State pursuant to subsection (a), such agency shall distribute the block grant funds involved for programs to which the funds relate and which are discontinued by this Act as referred to in section 1741(b)(1)(B).