NEW YORK CITY TRANSIT AUTHORI-
TY and Manhattan and Bronx Surface
Transit Operating Authority, Plaintiffs,

v.

EXXON CORPORATION et
al., Defendants.

No. 74 Civil 258.

United States District Court,
S. D. New York.

Nov. 22, 1976.

Alphonse E. D'Ambrose, Gen. Counsel, New York City Transit Authority, Brooklyn, N. Y., for plaintiffs; Gilbert T. Dunn, Edward W. Summers, Brooklyn, N. Y., of counsel.

Shearman & Sterling, New York City, for defendants; Joseph T. McLaughlin, Paul A. Merolla, New York City, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

The plaintiffs, New York City Transit Authority and Manhattan and Bronx Surface Transit Operating Authority, are public benefit corporations created by the Public Authority Law of the State of New York,[1] which operate buses in New York City. In April 1973 plaintiffs entered into separate contracts with defendant Exxon Corporation ("Exxon")[2] under which Exxon agreed to supply plaintiffs' requirements of diesel fuel oil for the operation of their buses between March 1, 1973, and February 28, 1974. Plaintiffs claim that Exxon breached this contract by failing to deliver diesel fuel after January 6, 1974, through to February 28, 1974, as a result of which plaintiffs allegedly were forced to purchase fuel from American Oil Company ("Amoco") at a substantially higher price. Exxon admits the making of the contract and the nondelivery during the period in question, but asserts that the mandatory federal oil

---

1. N.Y.Pub.Auth. Law §§ 1201, 1203–a (McKinney 1970).

2. Also named as defendants are Federal Insurance Company and North American Reinsurance Corporation, sureties on the bonds given by Exxon for the faithful performance of its

contracts with plaintiffs. These defendants are not, of course, liable unless their principal Exxon is. *Walcutt v. Clevite Corp.*, 13 N.Y.2d 48, 56, 241 N.Y.S.2d 834, 838, 191 N.E.2d 894, 897 (1963); *Eckstein v. Massachusetts Bonding & Ins. Co.*, 281 N.Y. 435, 24 N.E.2d 114 (1939).

allocation program established in October 1973 constitutes a complete defense to plaintiffs' claim.[3] The Court has previously denied defendants' motion for summary judgment, on the ground that two triable issues of fact existed: (1) whether Exxon had an excess supply of diesel fuel oil that was available and that was free of allocation restrictions, and (2) whether plaintiffs had consented to the substitution of Amoco as their fuel supplier for the period from January 7 to the end of February 1974.[4]

A brief explanation of the federal petroleum allocation program is necessary for an understanding of the facts of this case. By early 1973, oil company executives and officials within the Federal government had become aware of the possibility of an oil shortage because of increasing demand and declining domestic production. Hearings were held on the problem in June 1973 and in August 1973 a proposed mandatory petroleum products allocation program was announced.[5] In October 1973, following the outbreak of war in the Middle East, the Arab oil producing countries cut back their production of crude oil and embargoed exports to the United States. On October 12, 1973, shortly before the oil embargo was actually put into effect but in anticipation of it, the federal Energy Policy Office ("EPO") issued regulations[6] establishing a mandatory allocation program for middle distillate fuels,[7] effective November 1, 1973.

Under EPO Reg. 1, wholesale purchasers of middle distillate fuels, such as plaintiffs,[8] were required to obtain their current needs from their suppliers of record in the corresponding month of 1972, and the suppliers were generally obligated to satisfy those needs. The amount purchased in the corresponding month of 1972 was the purchaser's "base period supply volume."[9] If a customer had not purchased any middle distillates during 1972 but wished to purchase them while the allocation program was in effect, it could apply to the Department of the Interior to be assigned a supplier.[10]

Suppliers of middle distillate fuels were required to estimate their available supplies of middle distillates on a monthly basis and compute an "allocation fraction," defined as the amount of a supplier's available supplies divided by the sum of the base period supply volumes of its customers for that month and the amount necessary to supply customers assigned to it by the Department of the Interior.[11] If a supplier's allocation fraction was less than 1.0, i. e., it did not have enough middle distillates available to serve

3. The regulations establishing the petroleum allocation program were issued pursuant to authority granted by §§ 203(a)(3) and 204 of the Economic Stabilization Act of 1970, P.L. 91-379, 84 Stat. 796 (1970), as amended, P.L. 93-28, 87 Stat. 27 (1973), 12 U.S.C. § 1904 note (Supp. V 1975), and by §§ 4(a) and 5(b) of the Emergency Petroleum Allocation Act of 1973, P.L. 93-159, 87 Stat. 627 (1973), 15 U.S.C. §§ 753(a), 754(b) (Supp. V 1975). Since Exxon purported to cease deliveries to plaintiffs pursuant to the allocation program, federal jurisdiction is founded on § 210(a) of the Economic Stabilization Act, authorizing suits in the United States District Court by "[a]ny person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto . . . without regard to the amount in controversy," and on § 5(a)(1) of the Emergency Petroleum Allocation Act, 15 U.S.C. § 754(a)(1), which incorporates by reference the provisions of § 210 of the Economic Stabilization Act.

4. *New York City Transit Authority v. Exxon Corp.,* 70 F.R.D. 574 (S.D.N.Y.1976.)

5. 38 Fed.Reg. 21797 (1973).

6. 38 Fed.Reg. 28660 (1973). These regulations will hereinafter be referred to as "EPO Reg. 1."

7. Middle distillates are certain products of the petroleum refining process, including diesel fuel. EPO Reg. 1, § 2.

8. A "wholesale purchaser" was defined as any "person, firm, corporation, cooperative, or governmental unit that purchases middle distillate fuels in bulk at the wholesale level, including refiners, distributors, independent, branded and unbranded jobbers or dealers, public utilities, industries, or large volume users." EPO Reg. 1, § 2. Retail purchasers were not subject to the allocation program.

9. EPO Reg. 1, § 2.

10. *Id.* § 4(d).

11. *Id.,* § 4(f).

all its customers, it was required to provide each customer a pro rata amount of fuel equal to the customer's base period supply volume multiplied by the allocation fraction.[12] However, any "exempt volumes," that is, "supplies of each middle distillate fuel available to a supplier that are in excess of his base period supply volume," were not subject to allocation and could be disposed of as the supplier wished.[13] The price at which the fuel could be sold was not specified in the regulations, which were concerned with assuring equitable volumes of supply; however prices had to be in conformity with Cost of Living Council regulations and "bear a normal and reasonable relationship" to the price charged similarly situated purchasers.[14]

These regulations were clearly intended to supersede all existing contractual relationships insofar as necessary to effectuate the allocation program and achieve an orderly and equitable distribution of the available supply of petroleum products. Section 13 of EPO Reg. 1 provided that:

> Compliance with this regulation or rules or orders issued pursuant to this regulation may not be excused on the basis of any private contractual obligation.

Thus, regardless of existing contractual arrangements, a purchaser was generally required to obtain middle distillate fuels from its supplier for the corresponding month of 1972 and the supplier was required to sell fuel to those customers.

 However, some flexibility was built into the allocation program in an effort to minimize its disruptive impact and allow for increased or decreased delivery to individual customers as short run demand warranted. Section 4(e) of the regulations provided that:

> Suppliers and purchasers may agree among themselves to either borrow on future allocations or defer current allocations within the level of the total allocation for the year, as long as such arrangements do not result in an involuntary reduction in allocations to other purchasers. Similarly, suppliers may borrow or swap products among themselves.

This provision enabled a purchaser whose requirements in one particular month were in excess of its purchases in the corresponding month of 1972 to obtain additional fuel, provided that the supplier was still able to fulfill the allocations of its other customers and provided that the customer did not, over the course of the year, exceed the amount it had been supplied during all of 1972. Further, a user of middle distillate was allowed to purchase from someone other than its base period supplier if it could find a supplier with exempt supplies willing to sell them to the purchaser.[15]

EPO Reg. 1 remained in effect until January 15, 1974. On that date new regulations, promulgated by the Federal Energy Office ("FEO") pursuant to the Emergency Petroleum Allocation Act of 1973,[16] became effective.[17] The new regulations carried forward essentially the same system of allocation based upon 1972 base year suppliers which EPO Reg. 1 had established for middle distillates and applied it (with minor variations) to all petroleum products.[18] Unlike the earlier regulations, however, the FEO regulations controlled the price at

---

**12.** *Id.,* § 4(g).

**13.** *Id.,* §§ 2, 4(h).

**14.** *Id.,* § 8.

**15.** *Id.,* § 4(h). *See* County of Nassau, New York, 1 FEA ¶ 20,691 (1974); Better Home Heat Council, Inc., 1 FEA ¶ 20,131 (1974) (as amended). These opinions of the Federal Energy Administration, arising under the successor regulations to EPO Reg. 1, are entitled to great weight in interpreting the successor regulations, since the FEA was charged with their administration. *Udall v. Tallman,* 380 U.S. 1,

16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Since the later regulations did not change the essential outline of the allocation program, the agency's opinions are relevant in interpreting the earlier regulations as well.

**16.** 15 U.S.C. § 751 et seq. (Supp. V 1975).

**17.** 39 Fed.Reg. 1924 (1974). These regulations will hereinafter be referred to as "FEO Regulations."

**18.** FEO Regulations § 211.11.

which petroleum products could be sold.[19] As under the prior regulations, the FEO regulations authorized exchanges among suppliers, and borrowing or deferral of allocations by purchasers;[20] compliance with the new regulations was made a defense to an action for breach of contract.[21] Suppliers were free to dispose of any excess supplies over the amount required to be allocated after notifying FEO of the excess and affording FEO an opportunity to direct the disposition of the excess.[22] Thus, under the FEO Regulations as under EPO Reg. 1, a purchaser of middle distillates was required to obtain fuel from the same supplier as in the corresponding month of 1972, unless it could arrange an exchange or an advance against future allocations, or unless it could find a supplier with excess middle distillates willing to sell the excess to it.

During 1972 Humble Oil and Refining Company, Exxon's predecessor, had supplied diesel fuel to plaintiffs only in January and February; plaintiffs had been supplied by Amoco during the rest of the year. Thus Amoco was plaintiffs' base period supplier for November and December 1973, and Exxon was plaintiffs' base period supplier for January and February 1974. Under the allocation regulations plaintiffs were thus required to obtain their diesel fuel from Amoco in November and December and from Exxon in January and February, despite their contract with Exxon, unless a borrowing or exchange could be arranged or unless plaintiffs could find a supplier with excess supplies.

In the early part of November Exxon and Amoco agreed that Exxon would continue to supply plaintiffs throughout November and December 1973, and up to January 6, 1974, and that Amoco would supply plaintiffs from January 7 on.[23] This agreement was the sort of "swap" agreement contemplated by the regulations to meet short term supply problems.[24] It continued plaintiffs' supply of diesel fuel while saving Exxon, Amoco and plaintiffs the cost and trouble of repeated changeovers of suppliers. The agreement was entered into with the knowledge of plaintiffs although an issue is raised as to whether it was with their consent.

Exxon thereafter delivered fuel as agreed until January 6, charging plaintiffs the prices called for under their contracts.[25] On January 7 Amoco commenced delivery. At the time Exxon ceased delivery to plain-

---

19. *Id.*, § 212.1 et seq.

20. "(a) Any supplier may arrange to supply any purchaser for whom he has an allocation responsibility via another supplier or suppliers in accordance with normal business practice.
(b) In order to alleviate imbalance, suppliers and refiners may make normal business exchanges among themselves.
(c) To accommodate seasonal and other fluctuations in both supply and demand such as requirements for agricultural production, suppliers and wholesale purchasers may agree between and among themselves either to borrow on future allocations or to defer current allocations or both within the total allocations for one calendar year as long as such arrangements do not result in an involuntary reduction in allocations to other wholesale purchasers."
FEO Regulations § 211.25.

21. "Compliance with the provisions of the regulations of this chapter shall make available a defense to any action brought . . . for breach of contract in any Federal or State court arising out of delay or failure to pro-

vide, sell, or offer for sale or exchange any product subject to these regulations; provided, that such defense shall be available only if such delay or failure was caused solely by compliance with the provisions of this chapter."
FEO Regulations § 210.77; *see also* § 6(c) of the Emergency Petroleum Allocation Act, 15 U.S.C. § 755(c) (Supp. V 1975).

22. FEO Regulations § 211.11(b)(5).

23. Exxon had supplied plaintiffs with 5,436,400 gallons in January and February 1972, and Amoco had delivered only 4,923,641 gallons during November and December of that year. Thus, to ensure that each company delivered to plaintiffs the same amount it had in 1972 while keeping plaintiffs' supply of diesel fuel relatively constant, Exxon was required to supply plaintiffs for the first six days of January 1974.

24. EPO Reg. 1, § 4(e), quoted *supra.*

25. The contract price varied according to a formula based on the prevailing market price of kerosene.

tiffs, the cost to plaintiffs was 18.75 cents per gallon; at the time Amoco commenced delivery it charged plaintiffs 34.3 cents per gallon.[26] During the months of January and February plaintiffs paid Amoco over $400,000 more than they would have paid under the contract with Exxon, which they seek to recover by this action.

Plaintiffs admit that Exxon fulfilled all the terms of the contracts prior to November 1, 1973. Nor do plaintiffs dispute that the amount of fuel delivered by Exxon to plaintiffs between November 1, 1973 and January 6, 1974, equalled the full amount of plaintiffs' base period supply volume for January and February 1974.[27] Thus, plaintiffs had in effect borrowed their entire allocation for January and February 1974 and had it delivered to them by Exxon in November and December 1973. Under the allocation program plaintiffs were not entitled to receive any more fuel from Exxon unless Exxon had a supply in excess of that required to fulfill its obligations to other customers under the allocation program. Plaintiffs contend that during this period Exxon had such an excess supply which was not subject to the regulations and accordingly Exxon could have complied with its contractual commitments to plaintiffs.

■ However, the evidence establishes that Exxon did not have any excess supplies. Exxon executives testified at trial that during the months of November and December 1973 and January and February 1974, Exxon's allocation fraction for middle distillates was never greater than 1.0,[28] and that Exxon in fact sold less middle distillates during those months than it had during the corresponding months of 1972. Moreover, Exxon never certified to FEO, as required by the FEO Regulations, that it

had any surplus fuel. Indeed the former Assistant Administrator of FEO testified that to his knowledge no supplier of petroleum products in the United States reported a surplus during the months of January and February 1974. Finally there was undisputed evidence that there was a nationwide and indeed worldwide shortage of petroleum products during the period in question, and that despite Exxon's efforts to obtain additional petroleum from alternate sources the demand of its customers continued to exceed supply.

To attempt to overcome this persuasive evidence plaintiffs rely on the fact that two of Exxon's customers were, during the months of January and February 1974, supplied with more middle distillates than they had received in the corresponding months of 1972. The fact is, however, that during the entire year 1974 these customers received less fuel than they had received during 1972. The extra deliveries to them in January and February were no more than borrowing against future allocations, authorized by the regulations—exactly the sort of arrangement by which plaintiffs were supplied by Exxon in November and December 1973. Such a borrowing arrangement does not indicate the existence of excess supplies which Exxon could distribute under the allocation program. Rather it is merely a more rapid depletion of inventory than planned, to be compensated for in later months when the customer received less than its base period supply volume.

Plaintiffs are unable to point to any other evidence to support their contention that Exxon had excess supplies available to it during January and February 1974. Whatever plaintiffs' understanding of the arrangement between Exxon and Amoco

---

**26.** During November and December 1973 plaintiffs had attempted to determine what price they would have to pay Amoco. However, they were able to find out only that Amoco would charge them the market price at the time of delivery. After Amoco began deliveries plaintiffs sought and received confirmation that Amoco's higher prices were lawful under the Cost of Living Council regulations and the petroleum allocation regulations.

**27.** Plaintiffs received their full base period supply volume in each month rather than a pro rata proportion because they had been certified by the Governor of New York State as essential to the public welfare. *See* Office of Petroleum Allocation, Advisory Notice No. 2, 38 Fed.Reg. 31857 (1973).

**28.** It was 1.0 in November, .85 in December and January, and .87 in February.

496

was,[29] the fact remains that after delivering the full amount of plaintiffs' base period supply volume Exxon was not free under the allocation program to supply any more fuel after January 6, 1974.[30] The Court finds that Exxon's failure to deliver diesel fuel oil to plaintiffs after January 6, 1974, was caused solely by Exxon's compliance with the mandatory federal petroleum allocation regulations. Accordingly, judgment shall enter for the defendants.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

---

**29.** This disposition makes it unnecessary to pass upon defendant's further contention that its agreement with Amoco was entered into not only with plaintiffs' knowledge but with their affirmative consent, which constituted a ratification of the agreement by plaintiffs.

**30.** The allocation program provided civil and criminal penalties for noncompliance. EPO Reg. 1, § 18; FEO Regulations § 210.82. *See also* § 5(a)(3) of the Emergency Petroleum Allocation Act, 15 U.S.C. § 754(a)(3) (Supp. V 1975); § 208 of the Economic Stabilization Act, 12 U.S.C. § 1904 note (Supp. V 1975).