CITIZENS AGAINST the REFINERY'S
EFFECTS, INC., and Chesapeake Bay
Foundation, Inc., Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

Virginia State Air Pollution Control
Board, Intervenor.

Hampton Roads Energy Co., Intervenor.

No. 80–1223.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 6, 1981.

Decided March 5, 1981.

Bruce J. Terris, Washington, D. C. (James M. Hecker, Philip G. Sunderland, Washington, D. C., Karen H. Edgecombe, Patrick M. McSweeney, McSweeney, Stutts & Burtch, Richmond, Va., on brief), for petitioners.

Elizabeth Stein, Pollution Control Section, Dept. of Justice, Washington, D. C. (Raymond W. Mushal, Pollution Control Section, Dept. of Justice, Angus Macbeth, Deputy Asst. Atty. Gen., Land and Natural Resources Division, Charlotte Uram, Acting Chief, Pollution Control Section, Michele B. Corash, Gen. Counsel, Mitchell H. Bernstein, John D. Cooper, U. S. Environmental Protection Agency, Washington, D. C., on brief), for respondent.

Roger L. Chaffe, Asst. Atty. Gen., Richmond, Va. (Marshall Coleman, Atty. Gen. of Virginia, Richmond, Va., on brief), for intervenor Virginia State Air Pollution Control Board.

Gerald L. Baliles, John A. Gibney, Bell, Lacy & Baliles, Richmond, Va., Brent N. Rushforth, Albert H. Turkus, John P. Schnitker, Dow, Lohnes & Albertson, Washington, D. C., on brief, for intervenor Hampton Roads Energy Co.

Before HALL, PHILLIPS and SPROUSE, Circuit Judges.

K. K. HALL, Circuit Judge.

Citizens Against the Refinery's Effects (CARE) appeals from a final ruling by the Administrator of the Environmental Protection Agency (EPA) approving the Virginia State Implementation Plan (SIP) for reducing hydrocarbon pollutants. The plan requires the Virginia Highway Department to decrease usage of a certain type of asphalt, thereby reducing hydrocarbon pollution by more than enough to offset expected pollution from the Hampton Roads Energy Company's (HREC) proposed refinery. We affirm the action of the administrator in approving the state plan.

### The Act

The Clean Air Act establishes National Ambient Air Quality Standards (NAAQS) for five major air pollutants.[1] 42 U.S.C. § 7409; 40 CFR § 50 (1976). The EPA has divided each state into Air Quality Control Regions (AQCR)[2] and monitors each region to assure that the national standard for each pollutant is met. 42 U.S.C. § 7407. Where the standard has not been attained for a certain pollutant, the state must develop a State Implementation Plan designed to bring the area into attainment within a certain period. 42 U.S.C. § 7410. In addition, no new source of that pollutant may be constructed until the standard is attained. 40 CFR § 51.18 (1973).

The Clean Air Act created a no-growth environment in areas where the clean air requirements had not been attained. EPA recognized the need to develop a program that encouraged attainment of clean air standards without discouraging economic growth. Thus the agency proposed an Interpretive Ruling in 1976 which allowed the states to develop an "offset program" within the State Implementation Plans. 41 Fed. Reg. 55524 (1976). The offset program, later codified by Congress in the 1977 Amendments to the Clean Air Act, permits the states to develop plans which allow construction of new pollution sources where accompanied by a corresponding reduction in an existing pollution source. 42 U.S.C.

---

[1]. The five major pollutants for which standards have been developed are sulfur dioxides, carbon monoxide, nitrogen dioxide, particulates, and photochemical oxidants. 40 CFR § 50 (1976).

[2]. There are 247 ACQRs in the nation. Virginia has seven ACQRs.

§ 7502(b)(6) and § 7503. In effect, a new emitting facility can be built if an existing pollution source decreases its emissions or ceases operations as long as a positive net air quality benefit occurs.

If the proposed factory will emit carbon monoxide, sulfur dioxide, or particulates, the EPA requires that the offsetting pollution source be within the immediate vicinity of the new plant. The other two pollutants, hydrocarbons and nitrogen oxide, are less "site-specific," and thus the ruling permits the offsetting source to locate anywhere within a broad vicinity of the new source.[3]

The offset program has two other important requirements. First, a base time period must be determined in which to calculate how much reduction is needed in existing pollutants to offset the new source. This base period is defined as the first year of the SIP or, where the state has not yet developed a SIP, as the year in which a construction permit application is filed. 41 Fed.Reg. 55529 (1976). Second, the offset program requires that the new source adopt the Lowest Achievable Emissions Rate (LAER) using the most modern technology available in the industry. 41 Fed.Reg. 55528–9 (1976).

### The Refinery

HREC proposes to build a petroleum refinery and offloading facility in Portsmouth, Virginia. Portsmouth has been unable to reduce air pollution enough to attain the national standard for one pollutant, photochemical oxidants,[4] which is created when hydrocarbons are released into the atmosphere and react with other substances. Since a refinery is a major source of hydrocarbons, the Clean Air Act prevents construction of the HREC plant until the area attains the national standard.

In 1975, HREC applied to the Virginia State Air Pollution Control Board (VSAPCB) for a refinery construction permit. The permit was issued by the VSAPCB on October 8, 1975, extended and reissued on October 5, 1977 after a full public hearing, modified on August 8, 1978, and extended again on September 27, 1979. The VSAPCB, in an effort to help HREC meet the clean air requirements, proposed to use the offset ruling to comply with the Clean Air Act.

On November 28, 1977, the VSAPCB submitted a State Implementation Plan to EPA which included the HREC permit. The Virginia Board proposed to offset the new HREC hydrocarbon pollution by reducing the amount of cutback asphalt[5] used for road paving operations in three highway districts by the Virginia Department of Highways.[6] By switching from "cutback" to "emulsified" asphalt, the state can reduce hydrocarbon pollutants by the amount necessary to offset the pollutants from the proposed refinery.

EPA requested some changes in the state plan, including certain monitoring changes and verification from the Virginia Attorney General that the offset program was legally enforceable. The plan was transmitted by the EPA Region III director to EPA headquarters on September 9, 1978. Notices of the proposed plan were published on October 10, 1978 and again on May 1, 1979. 43 Fed.Reg. 46554 (1978). 44 Fed.Reg. 25471 (1979). Numerous comments were received,

---

3. The pertinent section in the Interpretive Ruling reads:

"In the case of emission offsets involving hydrocarbons or NOx, the offsets may be obtained from sources located anywhere in the broad vicinity of the proposed new source (within the area of nonattainment and usually within the source air quality control region). This is because area-wide oxidant and NO2 levels are generally not as dependent on specific hydrocarbon or NOx source location as they are on overall area emissions." 41 Fed.Reg. 55529 (1976).

4. Probably the best known photochemical oxidant is ozone.

5. "Cutback" asphalt has a petroleum base which gives off great amounts of hydrocarbons. "Emulsified" asphalt uses a water base which evaporates, giving off no hydrocarbons.

6. The three highway districts so designated comprise almost the entire eastern one-third of the state. This area cuts across four of the seven Virginia Air Quality Control Regions (AQCR).

including several from CARE. The EPA administrator carefully considered the comments and approved the Virginia offset plan on January 31, 1980.

CARE raises four issues regarding the state plan. First, they argue that the geographic area used as the base for the offset was arbitrarily determined and that the area as defined violates the regulations. Second, CARE contends that EPA should have used 1975 instead of 1977 as the base year to compare usage of cutback asphalt. Third, CARE insists that the offset plan should have been disapproved since the state is voluntarily reducing usage of cutback asphalt anyway. Fourth, CARE questions the approval of the plan without definite Lowest Achievable Emissions Rates (LAER) as required by the statute. We reject the CARE challenges to the state plan.

As in *Citizens Against Refinery Effects v. EPA*, 643 F.2d 178 (4th Cir. 1981), the standard of review here is whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Appalachian Power Company v. EPA*, 477 F.2d 495 (4th Cir. 1973).

### The Geographic Area

CARE contends that the state plan should not have been approved by EPA since the three highway-district area where cutback usage will be reduced to offset refinery emissions was artificially developed by the state. The ruling permits a broad area (usually within one AQCR) to be used as the offset basis. 41 Fed.Reg. 55529 (1976).

The ruling does not specify how to determine the area, nor provide a standard procedure for defining the geographic area. 41 Fed.Reg. 55529 (1976). Here the Virginia Board originally proposed to use four highway districts comprising one-half the state as the offset area. When this was found to be much more than necessary to offset pollution expected from the refinery,

the state changed it to one highway district plus nine additional counties. Later the proposed plan was again revised to include a geographic area of three highway districts.

The agency action in approving the use of three highway districts was neither arbitrary, capricious, nor outside the statute. First, Congress intended that the states and the EPA be given flexibility in designing and implementing SIPs. *See* H.R.Rep.No. 95–294, 95th Cong., 1st Sess., *reprinted in* [1977] U.S.Code Cong. & Ad. News 1077, 1290–92. Such flexibility allows the states to make reasoned choices as to which areas may be used to offset new pollution and how the plan is to be implemented. Second, the offset program was initiated to encourage economic growth in the state. 41 Fed.Reg. 55525 (1976). Thus a state plan designed to reduce highway department pollution in order to attract another industry is a reasonable contribution to economic growth without a corresponding increase in pollution. Third, to be sensibly administered the offset plan had to be divided into districts which could be monitored by the highway department. Use of any areas other than highway districts would be unwieldy and difficult to administer. Fourth, the scientific understanding of ozone pollution is not advanced to the point where exact air transport may be predicted. Designation of the broad area in which hydrocarbons may be transported is well within the discretion and expertise of the agency.

### The Base Year

Asphalt consumption varies greatly from year to year, depending upon weather and road conditions. Yet EPA must accurately determine the volume of hydrocarbon emissions from cutback asphalt. Only then can the agency determine whether the reduction in cutback usage will result in an offset great enough to account for the new refinery pollution. To calculate consumption of a material where it constantly varies, a base year must be selected. In this case, EPA's Interpretive Ruling establishes

the base year as the year in which the permit application is made. 41 Fed.Reg. 55529 (1976). EPA decided that 1977 was an acceptable base year. CARE argues that EPA illegally chose 1977 instead of 1975.

Considering all of the circumstances, including the unusually high asphalt consumption in 1977, the selection by EPA of that as the base year was within the discretion of the agency. Since the EPA Interpretive Ruling allowing the offset was not issued until 1976, 1977 was the first year after the offset ruling and the logical base year in which to calculate the offset. Also, the permit issued by the VSAPCB was reissued in 1977 with extensive additions and revisions after a full hearing. Under these circumstances, 1977 appears to be a logical choice of a base year.

### The Legally Binding Plan

■ For several years, Virginia has pursued a policy of shifting from cutback asphalt to the less expensive emulsified asphalt in road-paving operations. The policy was initiated in an effort to save money, and was totally unrelated to a State Implementation Plan.[7] Because of this policy, CARE argues that hydrocarbon emissions were decreasing independent of this SIP and therefore are not a proper offset against the refinery. They argue that there is not, in effect, an actual reduction in pollution.

The Virginia voluntary plan is not enforceable and therefore is not in compliance with the 1976 Interpretive Ruling which requires that the offset program be enforceable. 41 Fed.Reg. 55526 (1976). The EPA, in approving the state plan, obtained a letter from the Deputy Attorney General of Virginia in which he stated that the requisites had been satisfied for establishing and enforcing the plan with the Department of Highways. Without such authority, no decrease in asphalt-produced pollu-

tion is guaranteed.[8] In contrast to the voluntary plan, the offset plan guarantees a reduction in pollution resulting from road-paving operations.

### The Lower Achievable Emissions Rate

■ Finally, CARE argues that the Offset Plan does not provide adequate Lowest Achievable Emission Rates (LAER) as required by the 1976 Interpretive Ruling because the plan contains only a 90% vapor recovery requirement, places an excessive 176.5 ton limitation on hydrocarbon emissions, and does not require specific removal techniques at the terminal. EPA takes the position that the best technique available for marine terminals provides only a 90% recovery and that the 176.5 ton limit may be reduced by the agency after the final product mix at the terminal is determined.

Since the record shows no evidence of arbitrary or capricious action in approving the HREC emissions equipment, the agency determination of these technical matters must be upheld. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

### Conclusion

In approving the state plan, EPA thoroughly examined the data, requested changes in the plan, and approved the plan only after the changes were made. There is no indication that the agency acted in an arbitrary or capricious manner or that it stepped beyond the bounds of the Clean Air Act. We affirm the decision of the administrator in approving the state plan.

---

7. "Cutback" asphalt uses an expensive fuel base while "emulsified" asphalt uses water.

8. Despite the fact that the voluntary plan has been in force for several years, 1977 was the year of the highest consumption of cutback asphalt.