CONAGRA, INC., Petitioner, Appellant,

v.

Russell B. SWANSON, Commissioner, Department of Labor and Industry, State of Minnesota, Respondent.

No. C2-84-350.

Court of Appeals of Minnesota.

Oct. 30, 1984.

Dean G. Kratz, McGrath, North, O'Malley & Kratz, Omaha, Neb., Barbara L. Busch, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Scott R. Strand, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by POPOVICH, C.J., and LESLIE and CRIPPEN, JJ.

## OPINION

LESLIE, Judge.

The Minnesota Occupational Safety and Health Review Board found appellant ConAgra, Inc. had violated state occupational safety and health regulations. Upon appellant's petition for review, the district court found the review board's decision not contrary to law and supported by substantial evidence on the record. ConAgra appeals to this court contending the trial court erred by affirming the review board's decision. We affirm.

## FACTS

On or about November 27, 1979, a senior occupational safety and health investigator conducted a two-day inspection of ConAgra's grain elevator and flour milling operation in Fergus Falls, Minnesota. Following the inspection the Commissioner of the Minnesota Department of Labor and Industry issued citations for numerous safety violations falling within either a "serious" or "nonserious" level of severity. In January 1980 ConAgra exercised its right to contest the department's proposed action. A contested case hearing was held before a hearing examiner and the examiner found that the investigator properly issued some citations, but improperly issued others. ConAgra appealed the hearing examiner's decision to the Occupational Safety and Health Review Board. The review board affirmed some of the hearing examiner's findings and reversed others. ConAgra then petitioned for review of the Review Board's decision in Ramsey County District Court. The district court affirmed all parts of the Review Board's decision.

ConAgra appealed the district court's order affirming citations for maintaining a manlift without specified safety features, for failure to maintain adequate eyeflushing facilities, for an exposed electrical panel and for using electrical equipment not conforming to the applicable electrical code classification.[1]

1. Since this matter reached district court, ConAgra has been represented by Dean G. Kratz and Barbara L. Busch. Busch is licensed to practice law in Minnesota. Kratz is not. Kratz at no time moved for admission pro hac vice. All documents prepared on ConAgra's behalf and submitted in court bear both Kratz's and Busch's name but only Kratz's signature. At oral argument Kratz indicated that he prepared the notice of appeal and the brief submitted to this court and sent the documents to Busch. Busch stated that, although she did not sign either document, she reviewed both before personally filing them with the clerk of appellate courts.

## ISSUES

1. Does 29 CFR § 1910.68 apply to manlifts installed before its effective date?

2. Are the Occupational Safety and Health Review Board's conclusions supported by substantial evidence?

## ANALYSIS

■ Our review of administrative decisions is limited. Agency fact finding will not be disturbed if substantial evidence supports the finding. Minn.Stat. § 14.69(e) (1982). *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808 (Minn.1977).

■ Questions of law are reviewed on a different standard. Appellate courts are not bound by an agency's statutory interpretations. In federal OSHA cases the standard is whether an interpretation is reasonable and consistent with the purposes of the act. *S.J. Groves & Sons Co. v. Occupational Safety and Health Review Commission,* 648 F.2d 95, 97 (2d Cir. 1981). Courts often will defer to an agency's statutory construction, particularly when the statutory program is complex, the subject of the program is highly technical and the agency possesses expertise in the field. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965); *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977); *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission,* 342 N.W.2d 348, 351 (Minn.Ct.App.1983).

Minnesota's occupational safety and health program is governed by Minn.Stat. ch. 182 (1982). The Minnesota Department of Labor and Industry is authorized to promulgate OSHA standards and procedures. The department has adopted by reference federal OSHA standards. Minn. Rules 1983, 5205.0010.

Only licensed attorneys or specially admitted attorneys may practice law in Minnesota courts. The practice of law includes filing briefs and notices of appeal. In this case we find Busch's

*The Manlift*

■ Sometime in the late 1920's ConAgra installed a manlift in its facility. The manlift does not have various safety features such as railings and gates which are now required under 29 CFR § 1910.68 (1974). Section 1910.68 establishes safety standards and incorporates the American National Safety Standards for Manlifts (ANSI A90.1–1969). ConAgra contends its manlift is grandfathered out of regulation by 29 CFR § 1910.68(b)(3):

*Design requirements.* All new manlift installations and equipment installed after the effective date of this regulation shall meet the design requirements of the "American National Safety Standard for Manlifts ANSI A90.1–1969," and the requirements of this section.

For support ConAgra introduced at the hearing a letter it received from United States Occupational Safety and Health Administration stating it has interpreted section 1910.68 not to apply to its manlift. The review board found that this language freed ConAgra's manlift from the ANSI design requirements, but not from the section 1910.68 standards.

We find the review board's interpretation of subparagraph (b)(3) is consistent and reasonable. An earlier subparagraph of 29 CFR § 1910.68 entitled "General Requirements—(1) Application" states that it "applies to the construction, maintenance, inspection, operation of manlifts in relation to accident hazards." It says nothing about limiting application of the section's general requirements to new manlifts. Subparagraph (b)(3) falls in the middle of a section entitled "Design Requirements." Furthermore, the review board is not bound by federal interpretation of section 1910.68. Minn.Stat. § 182.655 requires Minnesota's program to be at least as effective as the federal program. It thus allows interpretation increasing the effectiveness of the program such as the review board's interpretation.

personal involvement sufficient to validate the notice of appeal and give this court jurisdiction but we disapprove of the manner in which ConAgra has been represented.

## Eye Flushing Facilities

ConAgra employs a chemist to test grain and flour samples. The tests conducted require the use of sulfuric acid and caustic soda. Usually the chemist is alone in ConAgra's laboratory, which is a part of its offices. ConAgra has a sink, a pullchain shower and a squeeze bottle of neutralizing solution in the laboratory. Evidence at trial showed that an eye contaminated with corrosive materials should be irrigated with water for at least 15 minutes at a minimum immediately after contamination. It also showed that neutralizing solutions are ineffective.

Under 29 CFR § 1910.151(c) employers whose employees may be exposed to corrosive materials must provide "suitable facilities for quick drenching or flushing of the eyes and body within the work area for immediate emergency use." ConAgra challenges for lack of substantial evidence the review board's conclusion that its shower, sink, and eyewash bottle were unsuitable. ConAgra relies upon a federal Occupational Safety and Health Review Commission case. *Deering Milikin, Inc., Avalon Plant*, OSHRC No. 76–417 (September 6, 1977). That case held that a bottle of eyewash solution, a water faucet with an attached hose, two sinks and restrooms provided adequate facilities.

■ In this case the review board relied upon evidence that a shower was a poor eye irrigating device since it would force corrosive materials further into an eye, that the chemist who worked with sulfuric acid usually worked alone, that an eye must be irrigated for 15 minutes immediately after contamination with sulfuric acid, and that neutralizing solutions were ineffective and could cause increased eye damage. Evidence also showed that better facilities such as special foot actuated basins or hoses are readily available. *Deering Milikin* differs from this case because that facility had a hose, and because the evidence did not establish that as strong a corrosive agent as sulfuric acid was used. We conclude the evidence substantially supports the review board's decision.

## Live Electrical Equipment Guards

When the investigator viewed the laboratory, he also found exposed electrical parts in the electrical panel box. The top half of the panel was missing, exposing an 11″ × 12″ area of wiring and contacts. The panel contains the circuit breaker switches for the laboratory and the adjacent office areas. ConAgra submitted evidence showing that the only person who worked near the panel was the chemist. The chemist had never opened the panel and had instructions not to open the panel. Only the plant manager opened the panel for electricians.

The review panel found ConAgra violated 1971 National Electrical Code (NEC) Article 110–17, incorporated in 29 CFR § 1910.309(a), which requires that all live electrical equipment parts carrying 50 volts or more be shielded by approved cabinets or other enclosures against accidental contact. One such enclosure is a room accessible only to qualified individuals. ConAgra attacks this finding for lack of substantial evidence.

ConAgra admits that any person touching the unshielded wires in the panel box could be electrocuted. It claims, however, that the location of the panel in the laboratory where only the technician worked met section 1910.309(a) standards. ConAgra relies upon *Ted Breihan Electric Co.*, 4 OSHC 1661, OSHRA No. 12457, (September 7, 1976) where an administrative decision vacated a penalty for a similar type of electrical box in an office occupied by seven electricians and two secretaries. The trial court found the electricians and the secretaries had been trained in the operation of the electrical equipment and knew the risks.

■ This case differs from *Ted Breihan.* The business involved there was an electrical company employing electricians and secretaries whom the trial court found had knowledge about such devices. Here ConAgra runs a grain elevator and a flour mill. ConAgra has not shown its employees possess any special knowledge about electrical

equipment in general or about the specific box in question. The electricians who service ConAgra's box apparently are not ConAgra employees. Second, the facts here show the panel box contained the circuit breakers for the laboratory and for the office. We hold the review board had sufficient evidence to find the live electrical parts were not adequately guarded.

*Grain Dust and Electrical Equipment*

Article 500–5 of the 1971 NEC, incorporated in 29 CFR § 309(a), classifies industrial locations and regulates the type of electrical connections and equipment that should be used for each class. One factor used to classify locations is the amount of combustible dust present.

The investigator found a light coating of dust in a number of locations throughout the elevator and mill. The investigator believed that these accumulations were normal for an elevator and mill, and that ConAgra kept the premises very clean. He found, however, that the level of dust and the unavoidable danger of greater levels created by grain spills placed its plant within NEC Class II Division 2 which requires a higher standard of electrical equipment. He noted that the type of dust involved is grain dust which is combustible.

The investigator further found that electrical junction boxes in ConAgra's plant did not conform to Division 2 standards because junction boxes were not designed to minimize the entrance of dust, (i.e. "knock-out" openings for conduit that could be easily knocked out and allow in dust, open screw holes, and an uncovered opening on the side of the box exposing wires). He also found five plug/receptacle fits that were not dust tight, and five breaks in conduit due to the use of non-flexible conduit.

The review board agreed with the investigator and concluded ConAgra's milling and elevator operation is within NEC Class II, Division 2 which is defined as:

Locations in which combustible dust will not normally be in suspension in the air, or will not be likely thrown into suspension by the normal operation of equipment or apparatus, in quantities sufficient to produce explosive or ignitable mixtures, but (1) where deposits or accumulations of such *dust may be sufficient to interfere with the safe dissipation of heat* from electrical equipment or apparatus, or (2) where such deposits or accumulations of dust on, in, or in the vicinity of electrical equipment *might be ignited by arcs, sparks or burning material* from such equipment.

NEC Article 500–5(b) (emphasis added).

ConAgra claims the evidence does not show it is within Class II, Division 2 and thus its electrical equipment need not meet the higher standards for that classification. Alternatively ConAgra claims evidence did not show its electrical equipment failed to meet those standards.

First, ConAgra argues that the combustibility of the light dust at its plant was not established. The investigator testified, however, that he found grain dust which is recognized as combustible in the comment to NEC Article 500–5(a).

■ ConAgra also insists that the level of dust accumulations in the plant do not meet the levels described in NEC 500–5(b). We find substantial evidence supports the review panel's conclusions that the dust condition in ConAgra's plant presents the Class II, Division 2 types of risks. Class II, Division 2 locations are areas where dust accumulations "may be sufficient" to interfere with heat dissipation or where dust "might be ignited" by an electrical charge. The comments to NEC Article 500–5 indicate those locations include areas where risk producing accumulations would develop only under abnormal operating conditions. The investigator found ConAgra's facility quite clean but found that greater levels of dust could develop when spills at the plant occur. In addition, the investigator did find a one-half inch accumulation on the top of a junction box indicating that a risk of substantial dust accumulations does exist. We cannot say this evidence is insubstantial, particularly when the meaning of the evidence is within the department's area of special knowledge.

Finally, ConAgra claims the review board's conclusion that its equipment did not meet Class II, Division 2 standards is not supported by substantial evidence. After reviewing the record we find little merit in ConAgra's position. Under NEC standards electrical equipment must be designed to minimize the entrance of dust. NEC art. 502–4(b)(1). The inspector testified that numerous junction boxes had knockouts (metal pieces that can be knocked out to produce an entrance to the box), and had open screw holes. The investigator also found five places where electrical conduit was broken requiring replacement with flexible conduit. Finally, several spark-producing and non dust-tight recepticles and plugs were found. This evidence supports the review board's conclusion.

### DECISION

The Occupational Safety and Health Review Board's interpretation of manlift regulations is proper. Substantial evidence supports the review board's finding that ConAgra's eye flushing facilities and its electrical panel guard did not meet state regulations. Finally, substantial evidence showed ConAgra's plant falls within NEC Class II, Division 2 and that its electrical equipment failed to meet those standards.

We affirm.