**The BALF COMPANY, INC.**

**v.**

**Alfred A. GATTA, In His Capacity as City Manager Of the City of Hartford, Connecticut and the City of Hartford.**

**Civ. No. H–80–451(AHN).**

United States District Court,
D. Connecticut.

April 1, 1986.

Ben M. Krowicki, Cohn & Birnbaum, P.C., Hartford, Conn., for plaintiff.

Donald V. Romanik, Asst. Corp. Counsel, City of Hartford, Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

NEVAS, District Judge.

This is a private civil action brought under 42 U.S.C. Section 1983 alleging that the acts of the defendants violated the Federal-Aid Highways Act, 23 U.S.C. Section 101 to 158, and the regulations promulgated thereunder. The plaintiff claims that the defendants' unilateral act in closing part of an Urban Systems Route on the Federal Aid Urban System to through traffic constitutes a modification or revision of a Federal-Aid Urban System in violation of federal law. Jurisdiction is based on 28 U.S.C. Sections 1331 and 1337. The plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. Sections 2201 and 2202 and damages. Trial in this action was bifurcated. This opinion concerns the issue of liability only.

The court finds the following facts, the majority of which have been stipulated to by the parties.

1. The Balf Company, Inc. is a Connecticut corporation with its principal offices, quarry and manufacturing facilities located on Newington Avenue (Hartford Avenue) in the Town of Newington. The plaintiff is engaged in the general paving business, and in the manufacture and delivery of gravel, sand, crushed stone, bituminous concrete and related products. (Tr. at 17).

2. Vehicles belonging to the plaintiff have regularly used Stone and Brookfield Streets in the course of its business since at least 1929. (Stip. para. 21).

3. Defendant, Alfred A. Gatta, is now the City Manager of the City of Hartford, Connecticut.

4. The City is a specially chartered municipal corporation, existing pursuant to the laws of the State of Connecticut.

5. 23 U.S.C. Section 103 establishes four "Federal-Aid Systems" which are systems of streets and/or highways eligible for Federal financial aid in planning, construction and reconstruction. One of the systems is the Federal-Aid Urban System. (Stip. para. 1).

6. Streets which are part of the Federal-Aid Urban System are referred to as Urban System Routes. Stone and Brookfield Streets are part of an Urban System Route on the Federal-Aid Urban System. (Stip. para. 2).

7. The City of Hartford is part of an "urbanized area" as that term is used in 23 U.S.C. Section 103(d)(1) and elsewhere in the Federal-Aid Highways Act. In "urbanized areas," 23 U.S.C. Section 134 and part 450 of Title 23 of the Code of Federal Regulations require the designation of a Metropolitan Planning Organization ("MPO") to perform the planning functions described in 23 U.S.C. Section 134. Pursuant to 23 C.F.R. Section 450.104(b), the MPO "is the forum for cooperative decision making by principal elected officials of general purpose local governments." (Stip. para. 3).

8. In the urbanized area of which the City of Hartford is a part, the Capitol Region Council of Governments ("CRCOG") has been designated as the MPO. Membership in CRCOG is voluntary. Presently 27 of 29 towns within the Capitol Region are members of CRCOG. Membership in CRCOG varies from time to time. The Policy Board of CRCOG is the policy making and advisory body for CRCOG. The Policy Board consists of thirty members, four of whom are elected officials of the City of Hartford. The chief elected officials of each of the twenty-six other towns within the Capitol Region which are members of CRCOG are the other members of the Policy Board. (Stip. para. 4).

9. All routes on the Federal-Aid Urban System have been functionally classified, pursuant to a process for which the relevant state highway agency is principally responsible. All classifications are ultimately approved by the Federal Highway

Administration. The Federal-Aid Urban System consists of arterial routes and collector routes, so designated on the basis of their anticipated functional usage. (Stip. para. 5).

10. Pursuant to classifications and standards adopted by the Federal Highway Administration, urban arterial routes have been further classified into principal arterial and minor arterial streets, and urban collector routes have been further classified into collector streets and local streets. According to such standards: "Local facilities emphasize the land access function. Arterials emphasize a high level of mobility for free movement. Collectors offer more or less balanced service for both functions." (Stip. para. 6).

11. In 1972 Stone and Brookfield Streets between New Britain Avenue and Flatbush Avenue were classified as "collector routes". (Stip. para. 35).

12. A new road connecting I-84 at Flatbush Avenue in the City of Hartford with the Town of Newington was planned by the Connecticut Department of Transportation at about the same time I-84 was planned and designed. The only part of this project actually constructed was the access ramp to I-84 from Flatbush Avenue which was opened to traffic on or about November 12, 1969. Between that date and July 29, 1975, when the State Traffic Commission first purported to adopt a regulation banning through trucks on Stone and Brookfield Streets and signs to that effect were posted by the City on Stone and Brookfield Streets, the plaintiff regularly used Stone and Brookfield Streets to gain access to I-84 from its quarry on Newington Avenue in the Town of Newington. (Stip. para. 22).

13. The Urban Systems route at issue in this action was added to the Federal-Aid System to serve traffic from the Hartford-Newington Town line to the Flatbush Avenue intersection of Interstate 84. (Tr. at 54).

14. This Urban System route ran from the City line north on Newington Avenue to New Britain Avenue. At that intersection the name of the road changed to Stone Street. The route continued northerly on Stone to the Dart Street intersection. It continued in a northwesterly direction on Brookfield Street. At the Brookfield Street-Flatbush Avenue intersection, the route turned in a westerly direction and continued on Flatbush Avenue to the I-84 interchange. (Exhibits 1 and D).

15. The plaintiff's trucks traveled from its quarry and manufacturing facility north on Newington Avenue across New Britain Avenue to Stone Street and Brookfield Street (Stone and Brookfield is a continuous thoroughfare. It is called Stone Street south of Dart Street and Brookfield Street north of Dart Street). (Tr. at 22) (*See* Ex. 1 and D).

16. By 1975 Stone and Brookfield Streets were upgraded from collector to a minor arterial due to its connection with I-84. (Stip. para. 38).

17. Pursuant to the Charter of the City of Hartford (hereinafter referred to as the "City") the City Manager of the City is the Traffic Authority of the City. (Stip. para 7).

18. On June 24, 1975, Edward M. Curtin, Jr., as City Manager of the City and on behalf of the City, wrote to the State Traffic Commission, requesting that:

... the State Traffic Commission complete an investigation into the feasibility of prohibiting the use of these City roadways (Stone and Brookfield Streets) to 'through trucks' between New Britain Avenue and Flatbush Avenue. (Parenthetic material added for clarification.) (Stip. para. 9).

19. In accordance with its usual procedures, the State Traffic Commission referred Mr. Curtin's request of June 24, 1975, to the Division of Traffic, Bureau of Highways of the Connecticut Department of Transportation for its evaluation and recommendation. (Stip. para. 10).

20. On July 22, 1975, the State Traffic Commission wrote to the City inquiring as to what alternate route the City recommended for through trucks traveling between the intersection of Newington Ave-

nue and New Britain Avenue and the intersection of the ramps leading to Interstate 84 and Flatbush Avenue in the event a regulation was adopted prohibiting through trucks from Stone and Brookfield Streets. (Stip. para. 11).

21. On July 25, 1975, in response to the State Traffic Commission's inquiry of July 22, 1975, Mr. Curtin forwarded to the State Traffic Commission the City's recommendation that if through trucks were diverted from Stone and Brookfield Streets, those trucks should be rerouted into West Hartford along New Britain Avenue, New Park Avenue and Flatbush Avenue. (Stip. para. 12).

22. In initiating and pursuing the request to the State Traffic Commission that a regulation be adopted prohibiting through trucks from Stone and Brookfield Streets in the City, the City Manager, and each of the City departments which studied this question and made a recommendation concerning this question were acting on behalf of, and in the interests of, the residents of Stone STreet, Brookfield Street and the immediately surrounding residential streets. (Stip. para. 13).

23. On July 21, 1975, the State Traffic Commission received the report and recommendation of the State Division of Traffic, Bureau of Highways, with regard to the request made by Edward M. Curtin, Jr. (Stip. para. 14).

24. The traffic investigation report recommended that the State Traffic Commission deny the City's request to prohibit through truck traffic on Stone and Brookfield Streets, and stated that "taking into consideration the protection and safety of the general public, it is the feeling of the State Traffic Commission that this present routing is the shortest and most reasonable routing available." (Stip. para. 15).

25. The State Highway Department is the final decision maker in determining which routes are to be recommended to the Federal Highway Administration for inclusion or deletion from a Federal-Aid System. (Tr. at 69–71).

26. Contrary to the recommendation of the State Division of Traffic, Bureau of Highways, the State Traffic Commission promulgated a regulation prohibiting through truck traffic on Stone and Brookfield Streets between New Britain Avenue and Flatbush Avenue. (Stip. para. 16).

27. On or about April 20, 1976, the Connecticut Legislative Regulations Review Committee, a committee of state legislators charged with the review of administrative regulations, disapproved this regulation. (Stip. para. 17).

28. Following the disapproval of the regulation by the Legislative Regulations Review Committee, a civil action, *Maloney v. Pac*, was filed in Connecticut Superior Court by a resident of the vicinity of Stone Street seeking a declaration that section 4–170 of the Connecticut General Statutes, pursuant to which the Legislative Regulations Review Committee disapproved the regulation of the State Traffic Commission prohibiting through truck traffic, was unconstitutional. (Stip. para. 18).

29. The City was a party to *Maloney v. Pac*, and in that matter took the position that Section 4–170 of the Connecticut General Statutes was unconstitutional or, in the alternative, that the prohibition of through trucks on Stone and Brookfield Streets adopted by the State Traffic Commission did not constitute a regulation, and was accordingly not subject to disapproval by the Legislative Regulations Review Committee. (Stip. para. 20).

30. On August 14, 1975, the plaintiff filed with the State Traffic Commission a petition for a declaratory ruling as to the applicability and validity of the purported regulation adopted on July 29, 1975. (Stip. para. 23).

31. The signs prohibiting through trucks on Stone and Brookfield Streets were removed by the City on or about May 20, 1976. Between that date and April 23, 1980, when the City erected a berm and posted signs prohibiting all through traffic on Stone and Brookfield Streets, the plaintiff continued to use Stone and Brookfield Streets in the ordinary course of its busi-

ness. The plaintiff has refrained from such use and has complied with the purported traffic regulation adopted by the City since the date of erection of the berm. (Stip. para. 24).

32. On July 14, 1979, Gerri Porter, a Senior Administrative Analyst with the City, wrote to Nicholas Carbone, Deputy Mayor of the City, and stated that in the absence of State approval of a through traffic prohibition, and pending the Supreme Court decision in Maloney v. Pac, "the City does not have the legal authority to prohibit the trucks." (emphasis in original). (Stip. para. 25).

33. On July 12, 1979, Nicholas Carbone, Deputy Mayor of the City of Hartford, wrote to Ruth St. Peter, a resident of Stone Street, and stated that with regard to Stone Street, the City would need State approval for "denial of through traffic." (Stip. para. 26).

34. By letter dated March 7, 1980, Bhupen N. Patel, Traffic Engineer of the City, solicited the opinion of certain residents of Stone Street and neighboring residential streets concerning "some changes to traffic patterns in the area which will affect you". That letter enclosed two proposals, one to create a pattern of one-way streets which would prohibit through traffic along Stone Street, and the second of which would close Stone Street and Brookfield Street to through traffic by the erection of a berm at the intersection of Dart Street. (Stip. para. 27).

35. Approximately 170 of these questionnaires were distributed by hand to residents of Stone Street and several surrounding residential streets on or about March 7, 1980. Ninety-six of the recipients of the questionnaire did not respond. Of the 74 responses received, 11 opposed both plans, 3 supported the plan for a system of one-way streets, and 60 supported the prohibition of through traffic on Stone and Brookfield Streets by the erection of the berm. The City collated and analyzed the responses to the questionnaire on or about March 18, 1980. (Stip. para. 28).

36. On March 10, 1980, the Court of Common Council of the City passed a resolution authorizing the City Manager of the City of Hartford to take action to "alleviate traffic concerns of those neighborhood residences" of Stone and Brookfield Streets. (Stip. para. 29).

37. On April 9, 1980, Donald C. Peach, City Manager of the City, wrote to the Mayor and members of the Court of Common Council of the City, and informed them that pursuant to the resolution of March 10, 1980, the City was implementing a plan to close Stone and Brookfield Streets to through traffic at the intersection with Dart Street by constructing an eight inch high, fifteen foot wide bituminous berm. (Stip. para. 30)

38. On April 23, 1980, City employees erected the bituminous berm across Brookfield Street at the intersection of Dart Street, and posted signs reading "Dead End" on Stone Street at the corner of New Britain Avenue; "Not a Through Street" on Brookfield Street at the corner of Flatbush Avenue'; "Dead End" on Stone Street at the corner of Arlington Street; and "Do Not Enter" at several other locations on both Stone and Brookfield Streets. (Stip. para. 31).

39. Prior to the erection of the berm by the City the Urban System Route, of which Stone and Brookfield Streets are a part, connected on both ends with other routes on the Federal-Aid Urban System. (Stip. para. 32).

40. Following the erection of the berm and the prohibition of through traffic, neither Stone Street or Brookfield Street connect on both ends with other routes on the Federal-Aid Urban System. (Tr. at 59–60); (See Ex. 1 and D)

41. Maloney v. Pac was finally decided by the Connecticut Supreme Court on March 17, 1981. The Supreme Court determined that the regulation adopted by the State Traffic Commission was not a "regulation" within the meaning of the Connecticut Uniform Administrative Procedure Act and accordingly was not subject to disapproval by the Legislative Regulation Re-

view committee. Accordingly, the Supreme Court did not address the issue of the constitutionality of Section 4–170. (Stip. para. 19).

42. Beginning in 1972, the City participated in a federally financed program known as "TOPICS" which was principally administered by the Connecticut Department of Transportation. As part of the City's participation in the TOPICS program, each of the City's roadways on the Federal-Aid Urban System was classified according to the type and volume of traffic carried by each such roadway. (Stip. para. 34).

43. At the time the City began to participate in the TOPICS program, Stone and Brookfield Streets, between New Britain Avenue and Flatbush Avenue, were classified as "collector routes." (Stip. para. 35).

44. As part of the TOPICS program, the City requested and received large sums of federal assistance for several roadway improvements the purpose of which was to increase the vehicular capacity and the design safety, for all types of vehicles, of Stone and Brookfield Streets between New Britain Avenue and Flatbush Avenue. (Stip. para. 36).

45. In conjunction with the TOPICS program, the City sought and obtained the re-classification of Stone and Brookfield Streets from New Britain and Flatbush Avenues, to a "minor arterial." (Stip. para. 37).

46. In a July 23, 1975, memorandum from Michael S. Dudeck, Jr., Assistant Traffic Engineer of the City, to Edward M. Curtin, Jr., City Manager, Mr. Dudeck stated:

> Stone Street-Brookfield Street was originally designated as a collector roadway, however, upon complete review of this route, its status was upgraded to that of a minor arterial due to its connection with the I–84 ramps. (Stip. para. 38) (Ex. 15).

47. On January 20, 1976, a public hearing was held before the State Traffic Commission concerning the proposed adoption of the regulation to prohibit through truck traffic on Stone and Brookfield Streets. At that hearing, Mr. Dudeck testified that Stone and Brookfield Streets had been designated as a minor arterial roadway. Mr. Dudeck was questioned at the hearing by a member of the State Traffic Commission as to whether Stone Street was properly classified as an arterial route or as a collector route. (Stip. para. 39).

48. On January 22, 1976, following that hearing and after the completion of the federally-financed improvements described in Paragraphs 49 through 57 below, the City sought and thereafter received approval of the Connecticut Department of Transportation and the Federal Highway Administration to redesignate Stone and Brookfield Street as a collector route, remaining on the Federal-Aid Urban System. (Stip. para. 40).

49. Under the TOPICS program, the City widened the roadway of Newington Avenue south of its intersection with New Britain Avenue. (Stip. para. 41).

50. Under the TOPICS program, the City straightened the alignment between Newington Avenue and Stone Street at their intersection with New Britain Avenue. (Stip. para. 42).

51. Under the TOPICS program, the City installed new traffic signalization at the intersection of Newington Avenue and New Britain Avenue. (Stip. para. 43).

52. Under the TOPICS program, the City widened the roadway of Stone Street, north of New Britain Avenue between New Britain Avenue and Broadview Terrace (one block). (Stip. para. 44).

53. Under the TOPICS program, the City installed new traffic signalization at the intersection of Brookfield Street and Flatbush Avenue. (Stip. para. 45).

54. Under the TOPICS program, the City widened the roadway of Flatbush Avenue, west of its intersection with Brookfield Street. (Stip. para. 46).

55. Under the TOPICS program, the City reconstructed a bridge on Flatbush

Avenue, which spans the Park River, to an unlimited capacity. (Stip. para. 47).

56. Under the TOPICS program, the City reconstructed the intersection of Flatbush Avenue and the ramps to Interstate 84. (Stip. para. 48).

57. Under the TOPICS program, the City installed new signalization at the intersection of Flatbush Avenue and the ramps to Interstate 84, which was interconnected with the traffic signal at the intersection of Flatbush Avenue and Brookfield Street. (Stip. para. 49).

58. In a communication regarding the Flatbush Avenue improvements under the TOPICS program, the Chief of the Municipal Systems Section of the Bureau of Highways of the Connecticut Department of Transportation wrote to the Division Engineer of the Federal Highway Administration:

> The subject project is consistent with the general plans of transportation and land use. Improvements through TOPICS of this section of road, the intersections involved and the bridge will expedite the flow of traffic both private and commercial. (Stip. para. 50)

59. Prior to the completion of the TOPICS improvements, the turning radius of the curb at the southwest corner of the intersection of Flatbush Avenue and Brookfield Street was 40 feet. The American Association of State Highway Officials ("AASHO") has determined that the minimum acceptable turning radius for the typical, over-the-road 55 foot tractor-trailer is 44 feet. AASHO has also determined that a 25 foot turning radius is adequate for private passenger automobiles. Under the TOPICS program the turning radius of the southwest corner of that intersection was increased to 60 feet. (Stip. para. 51).

60. Prior to the completion of the TOPICS improvements, the turning radius of the curb at the northeast corner of the intersection of Flatbush Avenue and the entrance ramp to Interstate 84 was 50 feet. Under the TOPICS program, the turning radius of the northeast corner of that inter-section was increased to 55 feet. (Stip. para. 52).

61. The turning radius of the curb at the southeast corner of the intersection of New Park Avenue and Flatbush Avenue is 25 feet. There is a bus stop on the east side of New Park Avenue, immediately south of the intersection of New Park Avenue and Flatbush Avenue, and the presence of a bus at that bus stop would make it impossible for a 55 foot tractor-trailer proceeding north on New Park Avenue to turn right to proceed east on Flatbush Avenue without encroaching onto the west-bound lane of travel of Flatbush Avenue. (Stip. para. 53).

62. There is an at-grade railroad crossing on Flatbush Avenue through which vehicles traveling on the alternate route recommended by the City would have to pass, and through which vehicles traveling on Stone and Brookfield Streets do not have to pass. There has been at least one collision between a train and a motor vehicle at that crossing. (Stip. para. 54).

63. Prior to undertaking the TOPICS improvements listed in Paragraphs 49 and 57 above, the City properly noticed, advertised and held a public hearing to which all members of the public, particularly those who might be affected by those improvements, were invited for the purpose of expressing their views and desires on the proposed improvements. No objection was expressed to any of the proposed improvements at the hearing. (Stip. para. 55).

64. On or about July 11, 1977, the Court of Common Council of the City passed a resolution authorizing the City Manager to submit requests for funding under the Federal Interstate Transfer Funds Program, 23 U.S.C. Section 103, for rehabilitation of several Urban Systems Routes in the City. (Stip. para. 56).

65. On or about December 7, 1977, James B. Daken, City Manager, acting pursuant to the aforementioned resolution, wrote to James F. Shugrue, Commissioner of the Connecticut Department of Transportation, and D.J. Altobelli, Division Administrator of the Federal Highway Admin-

istration, requesting federal interstate highway transfer funds in the amount of $2,100,000.00 for the rehabilitation of streets on the Federal Aid Urban System, including Brookfield Street between Flatbush Avenue and Dart Street. (Stip. para. 57).

66. On or about August 14, 1978, the Court of Common Council of the City passed a resolution authorizing the City Manager to execute an agreement between the City and the State of Connecticut for rehabilitation of streets on the Federal Aid Urban System, including Brookfield Street between Flatbush Avenue and Dart Streets. (Stip. para. 58).

67. Said agreement was executed by the State of Connecticut, acting through its Commissioner of the Department of Transportation, on August 31, 1978, and by the City, through its Acting City Manager, on August 16, 1978. (Stip. para. 59).

68. The rehabilitation of Brookfield Street between Flatbush Avenue and Dart Street included, but was not limited to, the installation of new curb; the excavation of pavement; placement of sewer and water structure; the construction of a flexible base; the laying of two-course pavement; and the laying of plastic lane markings. (Stip. para. 60).

69. Brookfield Street between Flatbush Avenue and Dart Street was reconstructed pursuant to the aforementioned contract during the approximate period between May and July 1980, after the erection of the berm on April 23, 1980. (Stip. para. 61).

70. The cost of the reconstruction and paving of Brookfield Street between Flatbush Avenue and Dart Street was approximately $1,000,000, substantially all of which was obtained from the Federal Interstate Transfer funds. (Stip. para. 62).

71. The City never notified the CRCOG prior to posting signs and erecting a berm prohibiting through traffic on Stone and Brookfield Streets (Stip. para. 63).

72. The City neither requested nor received approval to post signs or erect a berm prohibiting through traffic on Stone and Brookfield Streets from CRCOG. (Stip. para. 64).

73. The City never notified the Connecticut Department of Transportation prior to posting signs and erecting a berm prohibiting through traffic on Stone and Brookfield Streets. (Stip. para. 65).

74. The City neither requested nor received approval to post signs and erect a berm prohibiting through traffic on Stone and Brookfield Streets from the Connecticut Department of Transportation. (Stip. para. 66).

75. The City never notified the Federal Highway Administration prior to posting signs and erecting a berm prohibiting through traffic on Stone and Brookfield Streets. (Stip. para. 67).

76. The City neither requested nor received approval to post signs and erect a berm prohibiting through traffic on Stone and Brookfield Streets from the Federal Highway Administration. (Stip. para. 68).

77. On August 18, 1981, the State Traffic Commission voted to remove the no through truck traffic restriction on Stone and Brookfield Streets as originally approved on July 29, 1975. (Stip. para. 69).

78. As of the date of trial, the berm remained standing, effectively closing Stone and Brookfield Streets to through traffic. (Stip. para. 33).

79. Between the date on which through truck traffic was again permitted on Stone and Brookfield Streets, and the date on which the City closed Stone and Brookfield Streets to all through traffic, the City continued to consider means by which commercial traffic could be diverted from Stone and Brookfield Streets. The City was aware that prohibiting through traffic on Brookfield Street would have regional traffic implications, would tend to increase and disperse air and noise pollution, would adversely affect energy conservation, and that the best apparent alternative route would carry substantial volumes of traffic into the Town of West Hartford and would

be a longer and more congested route. (Exhibits 4, 19 and 21).

## DISCUSSION

■ The objective of the Federal-Aid Highway Act (FAHA), 23 U.S.C. Section 101 to 136 (1966 and Supp.1985), is to improve the nation's highway system by providing Federal financial aid for state and local highway construction. *Vermont v. Goldschmidt*, 638 F.2d 482 (2d. Cir.1980).

To achieve the Act's objective and to promote the efficient and effective development of a unified national transportation system, the Act prescribes a continuous and comprehensive planning process to be cooperatively carried out by states and local governments. 23 U.S.C. Section 134(a). The planning process requires consideration of long range land-use plans, development objectives and overall social, economic, environmental and energy conservation goals and objectives. *Id.*

The Act establishes four highway systems: Interstate, Primary, Secondary and Urban. Federal-Aid Urban Systems are located in urbanized areas to serve the major centers of activity. Routes on the Urban System are classified as either high volume arterial or collector according to their anticipated functional usage. 23 U.S.C. Section 103(d)(1). Local officials acting through the Metropolitan Planning Organization, (MPO), initially select routes for inclusion on the Federal-Aid Urban System. They designate each route as either arterial or collector according to the traffic carried by each route. In planning and selecting routes for the system, the MPO is to consider the goals and objectives of the communities and, where feasible, are to connect each route to other routes on the federal-aid system. 23 U.S.C. Section 103(d)(1). The selection is to be made with the concurrence of the state highway department and in conformity with the statutorily prescribed planning process.

After the planning process is completed the projects are submitted to the Secretary of Transportation for approval. 23 U.S.C. Section 105(a). No federal-aid project is eligible for federal funds until it is approved by the Secretary. 23 U.S.C. Section 103(f). The Secretary can approve the project as submitted or can require its revision or modification. *Id.*

This selection and planning process is required for the initial placement of routes on the federal-aid system as well as for any revisions or modifications to existing and approved routes. 23 C.F.R. Section 470.-107(c)(7).

The parties do not dispute the propriety of the selection, designation and approval process by which Brookfield Street was originally placed on the Federal-Aid Urban System or that the route is presently designated as a collector route on the Federal-Aid Urban System. The parties also agree that the defendants erected a berm and posted signs which closed Brookfield Street to through traffic from its intersection with Dart Street to its intersection with Flatbush Avenue and that the defendants did not receive approval or authorization to do so from either the Metropolitan Planning Organization (CRCOG), the State Highway Department or the Federal Highway Administration. There is also no dispute that, at the time the street was closed to through traffic it was designated as a collector and that federal highway funds were used for major improvements to Brookfield Street as well as to the other roadways on the system which formed a straight and continuous route from the city's southwestern border to the access ramp to I–84. *See* Exhibits 1 and D. The parties also stipulate that the Federal funds were used to improve Brookfield Street after it was closed to through traffic.

■ The issue before the court is whether the closure of Brookfield Street to through traffic constituted a modification or revision of a route on a Federal-Aid Urban System within the meaning of the Federal-Aid Highways Act and its regulations. If so, the plaintiff's right, as secured by a law of the United States, namely, the right to require any state that accepts federal highway funds to comply

with federal regulations has been violated. As the plaintiff is an intended beneficiary of that law, the plaintiff is entitled to redress under 42 U.S.C. Section 1983. *The Balf Co., Inc. v. Gaitor*, 534 F.Supp. 600 (D.Conn.1982).

Neither the Federal-Aid Highways Act or the regulations promulgated thereunder define revision or modification. The regulations provide that routes on the Federal-Aid Urban System are to be designated either as arterial or collector routes according to their anticipated functional usage, 23 C.F.R. Section 470.107(b). The regulations only describe urban arterial routes as "those public roads that are functionally classified as a part of the principal or minor arterial system as described in Vol. 20, App. 12 Highway Planning Program Manual." 23 C.F.R. Section 470.103(b)(6). Similarly, urban collector routes are only defined as public roads that are functionally classified as part of the urban collector system as described in the Highway Planning Program Manual. *Id.*

The Highway Planning Program Manual provides that minor arterials are designed to "provide service to trips of moderate length at a lower level of travel mobility than major arterials. This system contains facilities that place more emphasis on land access than the higher system and offers a lower level of traffic mobility and ideally should not penetrate identifiable neighborhoods." 20 Highway Planning Program Manual, App. 12 at II–13.

The collector street system is to provide "both land access service and traffic circulation within residential neighborhoods, commercial and industrial areas. It differs from the arterial system in that facilities on the collector system may penetrate residential neighborhoods, distributing trips from the arterials through the area to the ultimate destination.... The collector street also collects traffic from local streets in residential neighborhoods and channels it into the arterial system. In the central business district, and in other areas of like development and traffic density, the collector system may include the street grid which forms a logical entity for traffic circulation." *Id.*

The Federal-Aid Highway Manual includes an additional functional system designation entitled "Urban Local Street System" which includes all facilities not on one of the higher systems (arterial or collector) and are those routes that primarily provide direct access to abutting land and access to the higher order system. It offers the lowest level of mobility and "service to through traffic movement on a local street system usually is deliberately discouraged." *Id.*

A major difference in arterial and collector routes according to these descriptions is that collector routes are designed to penetrate residential neighborhoods. A major difference between collector and local routes is that on local routes through traffic is deliberately discouraged.

The City apparently recognized this distinction since it applied for a reclassification of Stone and Brookfield from minor arterial to collector in 1976. To justify the reclassification, the City stated "we have assessed the present land use along with present roadway and traffic conditions. The future of these street systems was also evaluated and it is our belief that the present stable mix of single family dwelling units along with the multiple family units will remain. At present, there is no commercial development on these streets nor is there any contemplated." *See* Ex. 23. The route was accordingly downgraded to collector so that its designation would conform to its anticipated use. Even though this request for reclassification was not occasioned by any change in the functional use of the Street, the City followed the mandated procedures.

The City now maintains that there was no need to seek State or Federal approval for the through traffic prohibition since there was no change in the functional use of the street. They take this position even though they previously sought approval from the State Highway Department to close the street and were turned down and even though they were advised by the Dep-

uty Mayor in 1979 that approval was necessary and even though they previously sought approval for reclassification of the route.

The City reasons that because the street continued to collect traffic from side streets and to feed it to an arterial following its closure to through traffic, there was no change in its functional use as a collector. This specious reasoning ignores the important facts that the use of the street as a through street was no longer possible and that the City's action effectively severed a route on a continuous Urban System. Closing the street to through traffic amounted to a change in its functional use. A change in functional use is a modification or revision of a Federal-Aid Urban System Route.

The description of collector routes does not contemplate, and cannot be fairly read to include, dead end streets or streets that do not facilitate traffic circulation or traffic mobility. It appears that following the street's closure to through traffic it functioned as a "Local Street" as defined by the Federal Highway Administration. Classification as a local street would be a more appropriate designation for a street that offers a low level of mobility and for one that deliberately discourages through traffic movement. *See* 20 Highway Planning Program Manual, App. 12 at II–13.

In construing the Federal-Aid Highway Act and the corresponding regulations, the court is guided by the credible testimony of Ernest W. Harris who had been with the Federal Highway Administration for 32 years, serving as Assistant Division Administrator for 14 years prior to his retirement in 1982. Mr. Harris, who was qualified as an expert, testified that the City's action in closing the street to through traffic constituted a modification or revision within the meaning of the federal regulations.

The Supreme Court has instructed courts faced with a problem of construing federal statutes or regulations to give great deference to the interpretation given to them by the officers of the agency charged with their administration. *Udall v. Tallman,*

380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

Mr. Harris stated that "when you post signs or restrict usage, you have changed the character of service that was intended when you put that route ... on the urban system." (Tr. at 57). He further testified that the acts of the City severed the Urban System in violation of federal regulations by cutting off its service capability. Following their acts the route contained two stubs that served no major traffic generator. A vehicle on that route could no longer connect from one urban system to another or from a primary to a secondary system. (Tr. at 57–60).

A central factor in this court's decision is the intent underlying the comprehensive planning process as required by the Act and regulations. The Metropolitan Planning Organization (MPO) has the responsibility, jointly with the State Highway Department, to carry out the planning provisions of the Act and to function as the forum for cooperative decision making in urban areas. 23 C.F.R. 450.104(3).

Hartford belongs to an urban area known as the Capitol Region. Twenty-seven of the twenty-nine area towns belong to the regional MPO which is called the Capitol Region Council of Governments (CRCOG). The governing body of CRCOG is made up of elected officials from each municipality. The composition of this highway planning organization reflects an intent to establish a non-parochial body which would consider and coordinate regional as opposed to purely local needs and concerns in planning federal highways. The planning organization was designed to provide a forum where the needs of neighboring communities could be coordinated and facilitated and where competing and inconsistent local needs could be accommodated and adjusted in a regional context. *See* H.R.Rep. No. 1554, 91st Cong., 2d Sess. (1970) *reprinted in* 1970 U.S.Code Cong. & Ad.News 5392, 5397.

The City of Hartford was aware of the regional ramifications its action in closing Brookfield Street would have on neighbor-

ing towns. *See, e.g.,* Ex. 19. Nonetheless, it proceeded unilaterally to contravene the statute and its goals, objectives and intent. It took this unilateral action after its proposal to close the street to through truck traffic was rejected by the State. The City was aware that the State rejected its proposal because the Stone-Brookfield route was the shortest, most direct and reasonable routing available considering the protection and safety of the general public. *See* Ex. 4. The City was also aware that its proposed action might force traffic into neighboring towns and that, while its action would solve a local problem, it would ignore issues of regional cooperation and regional transportation problems and their solutions. *See* Ex. 19. The City's actions undermined the basic integrity of the Federal-Aid Highways Act.

Federal regulations require that certain planning procedures be followed whenever a route on the urban system is modified or revised. The defendants cannot circumvent the planning and approval process by unilaterally changing the functional use of a route without following the mandated procedures.

The City applied for and received federal funds under the TOPICS Program. The funds were provided for the purpose of making improvements to Stone and Brookfield Streets from New Britain Avenue to Flatbush Avenue and Interstate 84. Federal funds used for highway projects are not outright gifts with no strings attached. They are paid for a particular purpose and their receipt is subject to definite conditions. *Leech v. Dole,* 749 F.2d 331, 336 (6th Cir.1984).

One of the strings attached to Federal-Aid Highway Funds is the regulations which the Secretary of Transportation promulgated to improve the highway systems, to reduce traffic congestion and to facilitate the flow of traffic. When the City applied for, accepted and used federal funds for highway improvements it became obligated to the federal government to comply with its regulations.

Approval of a project by the Federal Highway Administration creates a contractual obligation by which the federal government is required to reimburse states or municipalities for its share of a project's cost. *Vermont v. Goldschmidt,* 638 F.2d 482 (2d Cir.1980). A corresponding obligation is imposed on the state and the municipality to comply with the federal regulations.

The court is additionally not persuaded by the defendant's argument that the berm and signs erected on Stone and Brookfield Streets are merely traffic control devices which they have the prerogative to install on local streets. Even if the court were to ignore this argument's elevation of form over substance, it ignores the fact that another string attached to Federal-Aid Highway funds is the rules concerning the procedures for installation of traffic control devices on any highway project which receives Federal funds. *See* 23 U.S.C. Section 109(d); 23 C.F.R. Section 655 Subpart F.

The actions of the City of Hartford, acting through its City Manager, violated the letter as well as the spirit of the Federal-Aid Highway Act and its regulations. Having deprived the plaintiff of a right guaranteed by a law of the United States, *The Balf Co., Inc. v. Gaitor,* 534 F.Supp. 600 (1983), the City of Hartford and its City Manager, Alfred A. Gatta, are liable to the plaintiff under 42 U.S.C. Section 1983.

In view of the fact that trial was bifurcated, a hearing in damages will be held upon the filing of the appropriate motion requesting same.